# State *ex rel.* Attorney General, *v.* Jinwright, Sheriff.

*Impeachment Proceedings.*

(Decided May 25, 1911.   55 South. 541.)

*Sheriffs and Constables; Impeachment; Guarding Prisoners; Negligence.*—The evidence in this case stated and examined and held to show such negligence on the part of the sheriff as to authorize his impeachment for permitting a prisoner to be lynched.

Original petition in the Supreme Court.

Impeachment proceedings begun by the State on the relation of the Attorney General, to remove from office P. W. Jinwright as sheriff of Bullock County, on ac-

count of negligence in permitting a prisoner to be lynched. Judgment ordering impeachment.

ROBERT C. BRICKELL, Attorney General, R. B. EVINS, and J. D. NORMAN, for the State. No brief came to the Reporter.

ERNEST L. BLUE, L. M. MOSELEY, and A. A. EVANS, for respondent. No brief came to the Reporter.

SIMPSON, J.—This is a proceeding for the impeachment of said P. W. Jinwright, on account of the fact that one Aberdeen Johnson, who was in the jail of Bullock county, at Union Springs, in the custody of said sheriff, under a serious charge, was taken from his custody and put to death by a mob. The charges are: First, neglect; second, grave fault; third, willful neglect of duty; fourth, incompetency; and, fifth, connivance.

It is not denied that the mob placed the sheriff in handcuffs, battered down the steel door leading into the jail and also the door of the cell, and took the prisoner out and put him to death. It is shown that it took the mob about 30 minutes, without opposition, to get into the jail.

The defense offered by the sheriff is that, when the mob came to the courthouse and jail, in the morning, he had a conference with them, and they agreed to withdraw, and that they would offer no violence provided the prisoner would be delivered to the sheriff of Crenshaw county when he arrived on the train due at about 6:30 p. m. of that day. The evidence does show that such an agreement was made, that the mob withdrew, leaving their guns in the sheriff's office, and went to a restaurant, about a half mile distant, to get their dinner; that, while there, they were informed by

one of the citizens that a telegraph operator had caught a message going over the wire to the effect that the Governor was going to send troops to Union Springs; that the mob then, accusing the sheriff and his chief deputy of acting in bad faith with them, rushed back to the court-house, went into the sheriff's office, seized their guns, and, finding the sheriff in the hall of the court-house, handcuffed him, left him under guard in one of the rooms of the courthouse, and proceeded to break into the jail; that this was some time after 1 o'clock in the day.

After having secured a respite, by diplomacy, the sheriff was certainly under the duty to prepare for any emergency. There was no proof that the sheriff of Crenshaw county was really coming that evening. The sheriff knew that troops had been ordered, and that they would reach the place by 4:30 p. m. The Governor had given him positive orders to place a guard at the jail and protect the prisoner at all hazards, and his own statement shows that he apprehended that the mob spirit would show itself again, yet he did not make any effort to place a guard at the jail. It is true that he notified several citizens, in the morning, that they were deputized to assist him, some refusing and four agreeing to help him, including his chief deputy, yet he did not organize them, did not give them any order what to do, let them go off to their dinners at the same time, without any instruction or agreement as to when they were to return, left the jail without a single man in it, save the prisoners, left the arms of the mob in his office with the door open, and suffered himself to be completely surprised and overcome by the mob.

Much testimony was introduced by the defendant for the purpose of showing that the jail was indefensible, by reason of the fact that there were windows through

[State ex· rel. Attorney General, v̇. Jinwright, Sheriff.]

which a defending party could be fired upon by the mob
without. The weaker the jail, the greater was the ne-
cessity for protecting it. But these windows were all
steel-barred, and, aside from the fact that, by reason of
the bars, and their elevation from the ground, very few
shots could be so aimed as to strike persons within, a
sheriff, when he accepts the office, takes it with the
dangers incident to the discharge of his duties. To
measure up to the high duties of his office he must be
a man of courage and of resources. There was an ex-
cited mob in the town, some of them drinking. Many
of the citizens, if not in active sympathy with the mob,
had showed at least a disinclination to take any part
in preventing the actual accomplishment of their evi-
dent design, and it was not a time for sitting supinely
down, and resting implicitly upon the truce, when pre-
ventive measures might be adopted. As one of the wit-
nesses expressed it, it was a calm, but in all probability
only a calm before the storm. It was certainly his duty
to be prepared for a defense at this time. It seems ev-
ident that the sheriff, with three or four resolute men,
armed, could have prevented the entrance of the mob
into the jail. If there had been even *one* man on the
lookout, when the mob were seen returning to the
courthouse, the arms of the mob could have been se-
cured, by either placing them in charge of the deputies,
some of whom were sitting around without orders, or
else by fastening the door and windows of the sheriff's
office.

It matters not that the prisoner may have been
guilty of the most revolting crime known to our laws.
The next wave of popular frenzy might deprive of his
life one who, upon proper investigation, would be found
to be innocent. It is vain for us to write in our Consti-
tution that cherished heritage of English-speaking peo-

ple, that all persons accused of crime shall have the right to a "public trial, by an impartial jury," and shall not "be deprived of life, liberty, or property, except by due process of law," if our government cannot or will not enforce it. A law not enforced is no law at all. The sheriff who defends his prisoner from violence is defending the Constitution of his state, and perchance the lives, the liberty, and the happiness of his own family.

Upon a careful consideration of the evidence, and having in view the stringent provisions of our Constitution, we cannot escape the conclusion that the sheriff was negligent in this case.—*State ex rel. Garber, Attorney General v. Cazalas,* 162 Ala. 210, 50 South. 296. A judgment will be here rendered removing him from the office of sheriff of Bullock county. All the Justices concur.