## State, *ex rel.* Atty. Gen. *v.* Martin.

*Proceedings for Impeachment.*

(Decided February 14, 1913. 61 South. 491.)

*Sheriffs and Constables; Impeachment; Conduct.*—The term "willful neglect of duty" as used in section 173, Constitution 1901, does not necessarily import evil motives to make an officer guilty thereof; in this case it is held, that the evidence failed to make out a case for the state under any of its specifications beyond a reasonable doubt.

Original petition in the Supreme Court.

Proceedings by the state of Alabama on the relation of the attorney general to impeach William Martin as sheriff of Hale county. The defendant discharged.

The first specification is that the respondent, as sheriff, has been guilty of willful neglect of duty in allowing or permitting a prisoner in his charge as such sheriff, and under the sentence of death, to obtain carbolic acid or other poison for the purpose of self-destruction, thereby causing his death; for permitting or allowing a prisoner to receive or obtain any package without first ascertaining the contents of such package, and in this particular case thereby permitting a

[State, ex rel. Atty. Gen. v. Martin.]

prisoner to commit suicide; for knowingly giving a prisoner in his custody a bottle containing poison, thereby enabling such prisoner to commit suicide and avoid the penalty of the law. The second specification was incompetency, based on the same ground as that alleged for willful neglect of duty.

R. C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, represented the State. The case was submitted on oral argument and no briefs were filed.

EVINS & JACK, A. M. TUNSTALL, and JOE H. JAMES, for defendant. The case was submitted on oral argument and no briefs were filed.

PER CURIAM.—This court is of the opinion that the state has failed to make out its case as to either of the charges laid in the information, and therefore conclude, and it is the judgment of the court, that the defendant is not gulty, and that he be discharged and go hence.

McCLELLAN, J.—Section 173 of the Constitution of 1901, as presently important, reads: "The Governor, Lieutenant-Governor, Attorney General, State Auditor, Secretary of State, State Treasurer, Superintendent of Education, Commissioner of Agriculture and Industries, and Justices of the Supreme Court may be removed from office for willful neglect of duty, corruption in office, incompetency, or intemperance in the use of intoxicating liquors or narcotics to such an extent, in view of the dignity of the office and importance of its duties, as unfits the officer for the discharge of such duties, or for any offense involving moral turpitude

while in office, or committed under color thereof, or connected therewith. * * *" Section 174 subjects sheriffs, among other officers, to impeachment for the causes set down in section 173; and confers jurisdiction to hear and determine charges of impeachment against sheriffs and others upon the Supreme Court.

This proceeding invokes this jurisdiction in respect of the sheriff of Hale county. The charges against his conduct in or of office are willful neglect of duty and incompetency. His guilt or innocence cannot be adjudged without a definite judicial conception of what acts or omissions or official fitness or qualification these charges expressed in the fundamental law comprehend—what is requisite to constitute willfull neglect of duty or incompetency. Weight cannot be taken nor measure made without a standard therefor. So guilt or innocence cannot be pronounced without a definitely understood, well-defined charge—to which the judicial mind may apply the evidence to determine guilt or innocence. I cannot suppose that it was the intent of the makers of the present Constitution, or of preceding Constitutions containing similar causes for impeachment of officers, to commit to the Senate as a court of impeachment, or the Supreme Court exercising that great authority, any degree of discretion with respect to the removal of officers under the method of impeachment. On the contrary, my opinion is that the Constitution establishes definite, particular causes, for which only those officers may be impeached. There may be a measure of difficulty in arriving at a sound interpretation or construction of what these causes comprehend; but, notwithstanding, this furnishes no warrant for an assumption that any one of the causes for impeachment laid down in the Constitution is incomplete or may be supplemented or modified by recourse

[State, ex rel. Atty. Gen. v. Martin.]

to individual judicial judgment, whether in the Senate sitting as a court of impeachment or in the Supreme Court sitting as a court of impeachment. The highest officers of the state, including the executive and members of the Supreme Court, are made, by section 173, subject to removal from office for the causes there set down. An impressive and important duty thus requires in this proceeding the definition of the two causes which the information lays against the sheriff of Hale. On the trial of the sheriff of Tuscaloosa county (Latham), the intemperance feature of section 173 was considered and interpreted. Through some oversight the opinion on that subject has not been reported. It will be reported. And on the trial of the sheriff of Mobile county (Cazalas) *State ex rel. Garber v. Cazalas,* 162 Ala. 210, 50 South. 296, 19 Ann. Cas. 886, and on the trial of the sheriff of Bullock county (Jinwright) *Attorney General v. Jinwright,* 172 Ala. 340, 55 South. 541, section 138 of the Constitution was considered and interpreted.

From as full an investigation as I have been able to bestow, touching a subject about which a great deal, in text and decision, has been written, I find "willful neglect of duty," as employed in section 173, is an intentional failure or omission of an officer to perform a plain and manifest duty which he is able to perform when he omits to do so. Since it is impossible to intentionally omit the performance of a duty without a knowledge of the duty, the stated definition of "willful neglect of duty" implies knowledge of the duty so omitted to be performed. But to public officers in consequence of obvious public necessity must there be always and conclusively imputed a knowledge of their plain and manifest duties. No public officer can be heard to assert in justification or defense that he did not know

of the obligation assumed by, and imposed upon, him by a plain and manifest duty. There are, generally speaking, two classes of plain and manifest duties, viz., those expressly, unqualifiedly provided by law, fundamental or statutory, and those which necessarily inhere in, or arise from, the nature and purpose of the office. There is another class of duties resting on public officers, with which, however, under section 173, we are not concerned. This class comprehends those matters pertaining to official service which require for their proper disposal the exercise by the officer of judgment or discretion with respect to the ascertainment of a status or relation which, when found to exist, exacts a certain course of conduct or action on the part of the officer. There being with respect to plain and manifest duties attached to and running with a public office no right in the officer, or elsewhere, reposed to determine the relative necessity to perform such duties, and the imperative public requirement being that every such duty shall be performed, it is manifest that a prolonged, persistent omission, for any period of time, to perform one or more plain and manifest duties resting upon the public officer, is not an essential factor in guilt of willful neglect of duty. Such an omission to perform a single plain and manifest duty renders a public officer guilty of willful neglect of duty, notwithstanding he may not have previously so omitted to perform that duty. Any other rule would sanction, if not invite, in opposition to palpable public necessity, at least an intermittent observance of supremely important official obligations, immediately involving the public welfare, and thus not only encompass public officers with a large immunity from imperative obligation to perform their duties, but would commit to them a real discretion above the law.

The provisions of the organic law for the removal of public officers evince the highest degree of concern that public officers faithfully perform their duties. Such provisions, contemplating the removal of public officers for cause only, necessarily presuppose the twofold purpose, viz., to rid the public service of the unworthy instrument, and to insure the performance of duty by all officers, subject to removal, who are vested with public authority and discharge public functions. "Willful neglect" has long been accorded a distinct meaning and signification in the law. Unassociated the two words import a contradiction in terms, the former implying purpose, and the latter the absence of purpose.—30 A. & E. Ency. Law, p. 534; 40 Cyc. p. 947; *White v. State,* 123 Ala. 577, 587, 26 South. 343. In consequence the true interpretation of the expression made by their blending cannot be found in the abstract meaning of the two words when unassociated. This fact necessarily renders unimportant many adjudications defining "willful" alone or in other relations. The meaning accorded above to "willful neglect of duty" excludes the idea that, in order to be guilty thereof, the officer must entertain at the time an evil, bad, or corrupt motive or intent to omit to perform a plain and manifest duty. The public officers named in sections 173 and 174 of the Constitution take office voluntarily. Incumbents thereof subscribe an oath to perform the respective duties of such offices. They are compensated as provided by law. When such officers have qualified and taken office, they are necessarily and conclusively presumed to know the plain and manifest duties they have assumed to discharge for a reward, in addition to the honor implied in their preferments. The vital public interest in, and concern for, the faithful discharge of the plain and manifest duties thus voluntarily assum-

ed by the officers has been mentioned. This interest and concern is inspired by public necessity. Orderly government, security, peace, justice, particularly to the weak, depend upon the faithful observance by public officers of their public duties. In this voluntarily assumed relation of individual obligation resting on the officer and the so vital public importance attaching to his faithful service therein is there any sound basis for the suggestion that bad, corrupt, or evil motive or intent should, as a sine quo non to guilt of willful neglect of duty, color or effect the intentional omission of an officer to perform a plain and manifest duty which he was then able to perform? To so affirm is, manifestly to relegate the removal, by impeachment, of officers for "willful neglect of duty" to the category of some (not all) crimes.

Penal laws—to the violation of some of which a bad, corrupt, or evil motive or intent is essential—impose the terms and punishments upon the persons subject thereto without regard to their will. Not so with the public officer on whom the obligations of office rest by his own voluntary assumption alone. He promises, without constraint, to discharge for a reward the duties of the office he assumes. If he intentionally breaches that promise, knowing as must be implied his obligation thereby assumed with respect to plain and manifest duties, upon what moral or legal reason or consideration may there be rested the assertion that such an unfaithful officer shall still be immune from removal therefor unless, when his intentional infidelity was manifested he entertained, in the recesses of his conscious being, a bad motive or evil intent? I can conceive of none. If such motive or intent is read into the definition of willful neglect of duty, the well-founded twofold public purpose before alluded to must endure

great embarrassment, if not defeat, in its wise effectu-
ation.  If so interpreted, the charge of willful neglect
of duty will find the accused thus intentionally unfaith-
ful, armed with a measure of defense, presumed in his
behalf until overcome beyond a reasonable doubt,
against which no degree of positive proof can be ordi-
narily expected to be brought except the inference that
the omission itself of duty can afford—a refutory ele-
ment of conclusion from fact established that must in
the nature of the thing be in many cases practically
unavailable and often emphatically equivocal, even
where the intentional omission to perform a perfectly
known duty, which the officer was then able to perform,
is candidly admitted.  But, aside from this, it would
seem that, had the makers of the Constitution intended
to restrict the removal of such unfaithful officers to
those only whose conscious infidelity was evilly motived
or sinisterly purposed, they would have affirmatively
expressed the restriction, rather than have left it to
the uncertainty of an interpretation of the uncertain,
in this respect, word "willful"—a word to which this
court has often attributed a meaning and effect not
comprehending "evil motive" or "bad purpose" even in
definition of criminal offenses.  Furthermore, there
would appear to be no occasion or necessity suggested
by notions of caution or justice to surround conscious-
ly unfaithful officers with immunity from removal in
consequence of a factor of nonguilt of willful neglect
of duty that is founded upon a consideration beyond,
outside of, the obligation such officers voluntarily as-
sume.  To do so would be to say to the consciously, in-
tentionally unfaithful officer: "While you have thus
manifested your infidelity in a relation you for a re-
ward voluntarily assumed, you will not be subject to re-
moval for willful neglect of duty unless, when you so

neglected your known duty, you entertained an evil motive or bad purpose in so omitting the performance of your duty." I cannot believe such to be the intent of the Constitution with respect to officers willfully neglecting their duties.

There is, in my opinion, no just basis for a fear, if evil motive or bad purpose be not essential to guilt of willful neglect of duty as defined above, that upon public officers, subject to removal for that cause, will be imposed a too exacting performance of duty, wherefrom may follow disinclination on the part of good citizens to serve in those public offices. Undoubtedly a public officer who intentionally omits the performance of a plain, manifest duty which he is then able to perform, has no right to even a charitable consideration that would invite his retention in a relation to which he has been consciously unfaithful. Such an officer has, it seems to me, not only proven unfaithful to an affirmative trust, voluntarily and for a reward assumed by him, but he has not observed the oath which he has taken to faithfully perform the duties of his office. Apart from the considerations stated, the following authorities are persuasive to the view that "willful neglect of duty," as employed in section 173, does not import the necessity for evil motive or bad purpose, in order that a public officer may be guilty thereof.—*People v. Brooks,* 1 Denio (N. Y.) 457, 43 Am. Dec. 704; *Commonwealth v. Barry,* 3 Ky. (Hardin) 236, 237; *Williams' Case,* 83 Ala. 68, 70, 3 South. 743; *Harrison's Case,* 37 Ala. 154; 8 Words & Phra. pp. 74-77; *State ex rel. v. Examining Board, etc.,* 43 Mont. 389, 117 Pac. 77, Ann. Cas. (1912C) 143; *Odin Co. v. Denman,* 185 Ill. 413, 57 N. E. 192, 76 Am. St. Rep. 45, 48; *Minkler v. State,* 14 Neb. 181, 15 N. W. 330; *President, etc., v. State,* 19 Md. 239; *State v. McBrayer,* 98 N. C. 623,

2 S. E. 755; *People v. O'Brien*, 96 Cal. 171; 31 Pac. 45; 40 Cyc. pp. 947, 948, and notes; 30 Am. & Eng Ency. Law, pp 534-536, and notes.

"Incompetency," in this relation, was considered by this court in *State ex rel. v. Lowe* (in manuscript), Justice Sharpe writing the opinion. It was delivered February 5, 1903. It was then pertinently said: "Incompetency is by the Constitution and statutes of this state mentioned as a distinct ground for impeachment of public officers, including solicitors, and therein the term stands without qualification, except such as may be implied from the connection in which it is used and the apparent object of its use. It is safe to assume that neither of the other grounds of impeachment is intended to cover or to be necessarily coupled with this one, and therefore it may be further assumed that the disqualification at which it is aimed may exist independent of any willful neglect of duty, corruption in office, intemperance, or criminality. The exclusion of those other grounds leaves the term 'incompetency' little, if anything, to stand for other than mere incapacity for the performance of duties devolved by law on the official in respect of the particular office he fills. Such capacity on the part of the official is deemd essential to the accomplishment of the legislative purpose which was to supply a remedy for inefficient administration of office. It is possible that incompetency of an official may exist by reason of either physical or mental conditions, and that it may bring detriment to the public whenever from any cause it may occur. * * * But the law must be interpreted so as to allow it to operate reasonably, and such interpretation excludes from the term "incompetency' all such mere temporary incapacity as ordinarily attends, and is coterminous with acute disease. The incompetency which

.serves for impeachment is such as characterizes the usual status of the officer and which will therefore be continuous in some degree." This quotation was concurred in by the majority of the court, subject to the single limitation thereon, prevailing with their judgment, that the duration of the incompetency contemplated by the law must be such as to indicate beyond a reasonable doubt that it will continue during the remainder of the term of the accused officer. This limitation was suggested as the opinion shows by considerations pertaining to physical or mental disorders with which "all flesh" may be afflicted, and not to mental or physical infirmities such as characterize "the usual status of the officer." Hence, the limitation is without bearing in the case at bar.

"Incompetency," as involved in this instance, is "incapacity for the performance of duties devolved by law" upon the sheriff of Hale. In this connection, "incapacity" is synonymous with "unfitness, unsuitableness," for the service the law imposed upon the sheriff of Hale.—*Lowe's Case, supra.* The undisputed evidence presented on the trial was this: That the respondent as sheriff was himself the jailer of Hale county; that a janitor employed by the judge of probate was assigned to service at the jail; that on the 31st of December, 1912, there were a number of prisoners confined in the jail, among them one William Thomas who had been sentenced to death for crime; that his sentence had been suspended pending an appeal to this court; that on said date the janitor (as was his custom, we may assume as of fact) secured for and at the instance of Thomas and other prisoners six or seven small packages or sacks at the stores in Greensboro; that among these were raisins and a vial of carbolic acid, the acid being ordered by Thomas, and the money therefor

thrown by him out of the jail window to the janitor; that the janitor placed these packages at the outer jail door where packages and articles intended to pass into the prison were customarily put; that the vial of acid was wrapped in ordinary wrapping paper used at a drug store; that the sheriff later went to the jail entrance where the packages were, laid them on his arm, took them into the jail, and by his direction, a prisoner in the upper corridor of the jail delivered the packages to the several prisoners claiming, or who had sent for, them; that the vial of acid was thus delivered to Thomas; and that Thomas later drank the acid, and from its effect died in a few hours. It was further shown without dispute that the sheriff did not know the contents of any of the packages—did not know that the carbolic acid was among the contents thereof.

The sheriff himself testified, and there was no evidence or inference opposed thereto, that he had been a deputy under his predecessor; that while in that service it was the custom not to inspect or investigate the contents of packages or parcels which were to go in to the prisoners; and that during his service as sheriff (about three years) that custom was continued by him, he making no inspection or investigation of contents of packages or parcels found when he went to the jail at the jail entrance; that it was his practice as sheriff to carry in to prisoners, or to allow to be carried in to them, wrapped-up packages or parcels without inspection or investigation of their contents. The sheriff being shown, without dispute, to be entirely ignorant of the presence of carbolic acid among the packages which he thus contributed to have delivered, it is wholly immaterial whether Thomas had a malady that such acid would serve to ameliorate or cure, or whether it was a wise custom to have or leave such acids within

easy access of prisoners confined in the jail, or whether, as was urged, the negro, as a race, lacks, in his nature, the sensibilities or qualities of which felo de se is the product.

The two questions presented by the two charges are: Was this sheriff-jailer guilty of "willful neglect of duty" under sections 173-174 of the Constitution in delivering the packages as aforesaid to prisoners in his custody without inspection or investigation of their concealed contents? Or does the custom, the practice, observed by him in allowing packages or parcels, the contents of which are concealed from ordinary detection, to go in to prisoners without inspection or investigation, show him to be "incompetent?" By section 7191 of the Criminal Code upon the sheriff is imposed the legal custody of the jail in his county and of all prisoners lawfully committed thereto. With respect to the custody of prisoners, it is the manifest duty of the sheriff to not only exercise a high degree of care to prevent their escape or their subjection to harm from outside hostile sources, but also to exercise care to preserve his prisoners from injury to themselves or to each other. It is said in *Shields' Case,* 104 Ala. 38, 16 South. 85, 53 Am. St. Rep. 17, that the sheriff is charged with the duty of protecting and preserving the jail and of keeping the prisoners safely until legally relieved of their custody. The degree of care must enhance pari passu with the character of the prisoner, and with the cause for which his incarceration is effected. He should anticipate the motives that ordinary acquaintance with human nature would suggest as of likely entertainment by prisoners, especially those who stand charged or convicted of grave offenses. Not only may their efforts to escape entail danger to fellow prisoners who do not share that purpose, but they may under-

[State, ex rel. Atty. Gen. v. Martin.]

take to effect self-destruction by means that would submit to extreme hazard other prisoners who are powerless to protect themselves. The charge upon the sheriff is to safely keep prisoners lawfully committed to his custody. The law has not undertaken to express in statutes all the measures this broad duty imposes; but has left these measures in many cases to the sound prudence and judgment of the officer. There is no statute which exacts of a sheriff-jailer the particular duty of inspecting parcels or packages, the contents of which are concealed from ordinary view, before their admission to the prisoners in his custody. That such a duty exists is not to be doubled. But the question is whether an omission to observe that duty is "willful neglect," as before defined, on the part of the officer? There may be cases where the dictates of ordinary prudence, in the light of the great duty of custody imposed upon sheriffs, are so palpable as that an officer omitting the highest and most obvious precaution to preserve the prisoner as a treasure of the law would have imputed to him as of fact such a reckless disregard of plain and manifest duty as to enforce the conclusion that he was then willfully neglectful thereof. But the case of Hale's sheriff does not justify that conclusion under the charge of willful neglect of duty. Under the evidence, he was patently negligent. His fault lay in his want of prudence. In the exercise of a rational prudence he should have anticipated the reasonable possibilities that might flow from the disposition of charged or condemned prisoners to free themselves, or to defeat the enforcement upon them of the law's decrees. His duty in the premises was that which a sensible discretion and sober, responsible judgment should have suggested. He did not appreciate the hazard incurred nor realize the elements of his obligation. He was

therefore negligent in the performance of his duty, but not willfully neglectful thereof. He did not conceive that a full performance of duty required he should do the great necessity of a diligent surveillance of all articles and things entering his jail. So far as the janitor was concerned, he was not the sheriff's deputy, or official agent in any respect; and upon the janitor or his acts the sheriff could not rely to justify his want of care in the premises, or to modify the measure of care the situation and general duty resting on the sheriff required of him. Had the person serving as janitor been a deputy, doubtless a different factor would have affected the matter.—*Shields' Case, supra*; Code, § 7191. According to the interpretation given "incompetency" by this court in *Lowe's Case, supra,* that charge in this information has not been sustained. Negligence is not synonymous with incompetency. The most competent may be negligent. In this instance the negligence thus plainly appearing is in a sense and relation, single, individual. This Sheriff's service in office may have been otherwise excellent. The contrary has not been shown. To impute "incompetency" because of negligence would impeach the idea that incompetency, as our organic law employs it, is definitive of a usual status characteristic of the officer. Such an imputation would characterize as "incompetency" in or for office that which manifests no usual status of the office, but, and only, an act or omission that evinces a sporadic deficiency in judgment in a particular relation. The possibilities that may attend the negligent omission of a jailer to scrutinize every article or thing that he allows to pass in to his prisoners, or to be placed within their reach, suggest in the interest of the safe-keeping of prisoners and of the preservation of officers from assaults by prisoners in their care the necessity for a statute affirm-

atively establishing the appropriate duty in the premises. Such an enactment would not only conserve the public welfare involved, but, also, that of officers to whom the custody of prisoners is lawfully committed.

I concur in the finding that the charges laid were not established.