# Nelson, *et al.*, Jury Coms. *v.* State, *ex rel.* Blackwell.

## *Impeachment of Jury Commissioners.*

(Decided April 17, 1913.  Rehearing denied May 5, 1913.
62 South. 189.)

1. *Officers; Impeachment; Statutes.*—Impeachment proceedings are highly penal in their nature and governed by rules of law applicable to criminal cases; hence, the statutes and Constitution relative to such procedure are to be strictly construed.

2. *Jury Commission; Commissioners; Neglect of Duty.*—Where the jury commissioners exercising their judicial function pass on the qualification of jurors and make a new jury roll, in revising the jury box to conform to their judgment by leaving out or failing to place therein the names of persons they have adjudged incompetent, they are not neglecting their duty within the meaning of section 7, Acts 1909, p. 305, and sections 173, 175, Constitution 1901; this is true though their judgment be corrupt, or though they act incompetently.

3. *Same; Impeachment; Proof of Corruption.*—Where it is charged that in withdrawing a name from the jury box that the jury commissioners acted under the mere shadow and false color of their office—in other words corruptly or with wicked and vicious motives—the burden is upon the state to show corruption, and the question whether it has shown it is for the jury, as it rests in intention.

4. *Same; Willful Neglect of Duty.*—As used in section 173 and 175, Constitution 1901, authorizing impeachment of jury commissioners, "willful neglect of duty" means not only intentional omission of an act of duty, but that the incumbent is morally or mentally unfit; hence, the commissioners may show that they fairly stated the facts of their situation to legal advisers of good repute and acted in pursuance of their advice, as bearing on the question of willful neglect.

5. *Same; Withdrawing Names From Box.*—In proceeding to adjudge the occasion and necessity for action, and then in good faith taking action as a commission the jury commissioners are not within the purview of section 27, Acts 1909, p. 316.

(McClellan, J., dissents.)

APPEAL from Morgan Law and Equity Court.

Heard before Hon. A. H. ALSTON.

Impeachment proceedings by the state on the relation of Blackwell as solicitor against James S. Nelson and others as jury commissioners of Morgan county. From a judgment impeaching the jury commissioners they appeal. Reversed and remanded.

CALLAHAN & HARRIS, and O. KYLE, for appellant. The proceeding is quasi criminal, and the statutes and constitutional provisions governing the same must be strictly construed. The word "willful" as here used, means done with a bad motive.—3 L. R. A. (N. S.) 456; 96 U. S. 727; *McManus v. State,* 36 Ala. 285; 40 Cyc. 944; 29 A. & E. Enc. of Law, 114. It, therefore, becomes a question of intention, and a matter for the jury to determine.—*Dotson v. State,* 62 Ala. 114; *Gorden v. State,* 52 Ala. 309. This is true even in civil cases.— *Anniston E. & G. Co. v. Rosen,* 159 Ala. 206; *B. R. & E. Co. v. Bowers,* 110 Ala. 645. The information did not charge the commissioners with the offense denounced by section 27 of the jury act, or if it was intended so to charge, it cannot be said that they were within the provisions of said section, if they adjudged the occasion and necessity for action, and then acted in good faith. —12 Cyc. 131; 25 Cyc. 272; *Gilman v. State,* 165 Ala.

135; *Planters I. Co. v. Tunstall,* 72 Ala. 150; *Clifton v. State,* 73 Ala. 473. It follows that the court erred in giving the general charge, and the cause should be re-reversed and remanded.—65 Fed. 161; 112 S. W. 1084, and authorities supra.

R. C. BRICKELL, Attorney General, W. L. MARTIN, Assistant Attorney General, E. W. GODBEY, and W. R. WALKER, for the State. The statutes and Constitution governing the proceedings will be found in section 7099, 7101, et seq., Code 1907, and Constitution sections 173 and 175. Ignorance of the law is no excuse for its violation.—*Walker v. State,* 91 Ala. 76; *Toole v. State,* 88 Ala. 158; 1 East P. C. 42. The intent essential to crime is the intent to do an act which is violative of the law. There need be no intent to violate law.—*Eldridge v. State,* 126 Ala. 63; *Collins v. State,* 152 Ala. 90; *Fielding v. State,* 135 Ala. 56; *Mullins v. State,* 82 Ala. 42; 62 Am. St. Rep. 800; 23 Am. St. Rep. 182; 25 L. Ed. 244. Whenever one does an act in itself legally wrong the law presumes the intent to be there, and the act of itself is evidence of the legal intent.—Authorities supra; *Thomas v. State,* 92 Ala. 85; *Stein v. State,* 37 Ala. 123. Every intentional act is necessarily a willful one, and when a person knows what he is doing and intends to do what he is doing, and is a free agent, the act is willful.—Authorities supra, and *K. C. M. & B. v. Crocker,* 95 Ala. 412; *Harrison v. State,* 37 Ala. 156; 19 N. W. 940; 57 N. E. 192; 50 S. E. 30; 30 ·A. & El/ Enc. of Law, 528-9; 1 Denio 457; 62 N. Y. 299. Moral turpitude is anything done contrary to justice, honesty, principle or good morals.—Authorities supra. Under these authorities the offense charged involved moral turpitude, and brought the commissioners within the purview of sections 7 and 27, Acts 1909, p. 305.

SAYRE, J.—This is the case of an information for the impeachment of two members of the jury commission of Morgan county. The information contains four charges proceeding under the authority of sections 173 and 175 of the Constitution, which, when read together, authorize the impeachment of jury commissioners "for willful neglect of duty, * * * or any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith."

Count 1, so to speak of the first charge stated in the information proceedings, for willful neglect of duty, in that defendants, after having emptied the jury box preparatory to refilling the same, did unlawfully and willfully leave out of said box and fail to place therein the names of certain male citizens of the county, designated separately in some dozen specifications, who were eligible for jury service and whose names had been duly entered upon the jury roll and upon cards prepared in accordance with the direction of the statute, all which facts were then and there known to defendants. The remaining counts proceed for the commission of an offense involving moral turpitude, to wit, the offense of unlawfully withdrawing or removing the names of eligible jurors from the jury box after the box had been replenished and the jury roll made up. A further statement of the detailed averment of these counts is unnecessary.

An examination of the statute under which defendants were acting (Acts Sp. Sess. 1909, pp. 305-320) reveals the fact that duties of two distinct classes are thereby imposed upon jury commissioners. For one, they are required to prepare a jury roll to contain the names of every male citizen of the county possessing the prescribed qualifications of jurors and not specifically exempt. The statute provides a clerk, and contemplates that he shall perform the clerical labors of

the commission, keep its records, and certify to their
contents. To the end that every male citizen possessing
the prescribed qualifications and not exempt may be
enrolled, and none other, the commission may summon
witnesses, administer oaths, and take testimony touch-
ing the qualifications of any person residing in the coun-
ty. The jury roll is the evidence of the commission's
judgments. The determination of the qualifications of
prospective jurors involves the judicial function.
"Whenever the law vests a person with power to do an
act and constitutes him a judge of the evidence on which
the act may be done, and at the same time contemplates
that the act is to be carried into effect through the in-
strumentality of agents, the person thus clothed with
power is invested with discretion, and is quoad hoc a
judge."—23 Cyc. 504. For the other, duties of a me-
chanical, clerical, and administrative nature are im-
posed. It will be noted that the information would
seem to avoid a charge of dereliction in respect to the
preparation of the jury roll or in the determination of
the qualifications of the persons whose names were plac-
ed thereon. Its effect is to charge official misconduct,
misfeasance, malfeasance, or nonfeasance in the per-
formance of duties mechanical, clerical, or administra-
tive.

The specific effect of count 1 has been stated. It
charges the willful doing, or the willful failure to do,
an act which may with propriety be designated as either
a nonfeasance, misfeasance, or malfeasance, for these
terms cover a certain common field within which the act
or omission charged seems to fall.

Impeachment proceedings are highly penal in their
nature, and are governed by the rules of law applica-
ble to criminal causes. Constitutional and statutory
provisions on the subject of the procedure in such cases,

are to receive strict construction in favor of the accused. —*State v. Buckley,* 54 Ala. 599; *State v. Robinson,* 111 Ala. 482, 20 South. 30; *State v. Lovejoy,* 135 Ala. 64, 33 South. 156.

Section 7 of the act provides that any commissioner, or clerk of a commission, who neglects to perform any duty imposed upon him by the act, is guilty of a misdemeanor. The averment of the count or charge in question is that the jury box had been emptied preparatory to refilling. It is not charged that the box was unlawfully emptied. And section 12 of the act makes it entirely clear that the commissioners must at times and in a certain event empty the jury box preparatory to refilling it. At such times they are also to make and certify a new jury roll. For aught appearing to the contrary in the averments of the count, the commissioners had an indubitable right to enter upon the business of creating a new jury roll and the refilling of the box, and of necessity while so engaged they had a right to change or revise any previous judgment in respect to the qualification of any prospective juror, and this right they might exercise, proceeding, of course, in good faith as a commission organized and sitting for the purpose of discharging their duties under the statute, until all questions were finally determined; and probably the statute contemplates that the determination of finality shall be evidenced by the delivery of the refilled jury box to its custodian of statutory appointment, thus putting it beyond the power and control of the commission. In such revision and in making the contents of the jury box answer to their judgment by leaving out or failing to place therein the names of persons adjudged to be ineligible, though that judgment be erroneous, the commissioners, whatever else may be said of their course, are not neglecting their official duty. Provided only

they act in good faith as a commission, they are discharging their duty under the law, incompetently and mistakenly it may be, but acting nevertheless virtute officii, and it may be with most anxious regard for their responsibilities under the law.    In that case they are untouched by the criminal section of the statute or the constitutional provision on the subject of removal from office on the ground of willful neglect of official duty. If the commissioners act incompetently or their judgments are corrupt, they may be removed   for   those causes; but on no just or reasonable construction of the Constitution, the statute, and the facts averred can they be held to have neglected their duty under the statute.

The remaining counts were intended to express the pleader's conclusion that jury commissioners are guilty of an act involving moral turpitude whenever they withdraw from the jury box the name of an eligible prospective juror after the box has been replenished and the jury roll made up.   The theory of these counts or charges is that section 27 of the statute makes certain acts felonies and so attaches to them the quality of moral turpitude.   The section reads:   Any person who shall unlawfully place in, or withdraw from, the jury box any name or names of persons, or destroy, cancel, or remove such jury box, or place on or erase from the jury roll the name of any person, or destroy, mutilate, conceal, or remove such jury roll, shall be guilty of a felony, etc.

Why the pleader, in the pursuit of any consistent theory of the statute, should have alleged that the persons whose names were withdrawn were eligible as jurors does not appear.   The terms of the section make no distinction between the withdrawal of the names of eligible and ineligible persons.   Jury commissioners have

the undoubted power in the first place to determine judicially the eligibility of prospective jurors, and if the section has reference to the acts of commissioners, and was intended to punish the withdrawal of the names of eligible persons only, that would give them the power to judge again of eligibility. But this point is of no material consequence. As we have said, the section does not discriminate, and the averment of eligibility must be treated as unnecessary and redundant.

Section 27 says nothing of intent. Offenders against it are made felons without regard to intent. If it applies to commissioners, it does not as to them perfectly define the several acts denounced as felonies, for the letter of the statute in other places, and the exercise of the functions for which the commission was created, require that at some time they do most of the things denounced, nor is any negation of their power to do these things at any time to be found except in the negative implied by section 12, where they are commanded to make and certify a new jury roll and refill the box when the box is exhausted or so far depleted that it will probably be exhausted at the next drawing of jurors. In *Jury Commission v. State,* 178 Ala. 412, 59 South. 594, this implied negation was held effectual to deprive the jury commission of power and jurisdiction except in the conditions specified in section 12, and to render proper a writ of mandamus to compel the restoration of the status quo ante, where the commissioners had assumed to act in the absence of such conditions. In that case it was also held that the existence of the conditions calling for the making of a new jury roll was to be found by the commission, and that must be the case; for, while the duty of preparing a new roll and refilling the box is put on them in the event of a probable exhaustion, no

means, method, or agency for deciding whether exhaustion is probable are anywhere pointed out.

It may be that a proper construction, though strict, of section 27 of the statute would hold the penalty therein prescribed was intended for jury commissioners who do any of the acts denounced in their mere individual capacity, or even where they undertake to act in their corporate capacity as members of an organized commission under a corrupt and false color of office, and such is the intimation of the argument in *Jury Commissioners v. State, supra.* But it is inconceivable, and no language of the statute requires us to hold otherwise, that the legislature intended that the individual members of a jury commission, which proceeds to adjudge the occasion and necessity for action and then in good faith takes action as a commission, virtute officii, should be held for felons when they mistake the law or the facts.

We think there is no necessity for a discussion of the disputed proposition that the doing of an act malum prohibitum only, and done ignorantly or under a mistaken apprehension of the law, must be taken to imply necessarily moral turpitude when the act is by statute denounced as a felony without regard to the intent with which it is done. The charge of the last three counts of the information is that defendants, when they unlawfully drew names from the jury box, acted under color of their office as jury commissioners of Morgan county. Without saying whether any additional averment was necessary to make good this charge, we note that the import of the averment as made is that defendants acted under the mere shadow and false color of their office; that is, corruptly or with wicked and vicious motive.—7 Cyc. 402. It was therefore incumbent on the state to prove corruption, and the question

whether it had been proved, resting in intention, was a question for the jury.

Recurring now to the first charge of the information, we will consider briefly what is there meant by willful neglect. Let it be noted that we are considering "willful neglect" according to its meaning in the Constitution and not "willful neglect" as used in the statute, for the proceeding here is not an indictment under the statute, but is an impeachment proceeding under the Constitution. The Constitution does not authorize the impeachment of an officer on the ground that he has committed a misdemeanor unless the misdemeanor involves moral turpitude, and it is perfectly clear that not all misdemeanors, particularly statutory misdemeanors, involve moral turpitude. Nor does the Constitution any more in terms authorize impeachment for felonious offenses unless they involve intrinsic moral turpitude, or unless the Legislature by denouncing as a felony an act inherently lacking in moral quality thereby changes and fixes its moral character for the worse. The power to do that may be doubted. Confessedly, "willful" has various meanings; but its meaning in any particular place or connection is to be determined upon consideration of the uses and purposes it is there serving. We do not intend, however, to decide that "willful neglect" in the Constitution means anything different from "willful neglect" in the statute. That question is not presented. We are directing attention only to the principle that the intention of the framers of the Constitution must in this proceeding under the Constitution be given effect in any event.

That "willful neglect," as used in the Constitution, means something more than simple neglect, or the neglect of mere inadvertence, is obvious. The contention for the state is that "willful," as used in the Constitu-

tion and in this information, means only that defend-
ants intended to do the specific acts charged, and that
their good or bad purpose is immaterial; and many
cases are cited in which it was so held in respect to the
word when used in criminal statutes. Per contra,
Judge Stone said in *Johnson v. State,* 61 Ala. 9 : "Will-
fully is a strong word, much stronger than the word
intentionally. * * * It means governed by the will,
obstinate, perverse." The word "willfully," in the or-
dinary sense in which it is used in statutes, was said
by Chief Justice Shaw, in an opinion of most unusual
interest, to mean not merely "voluntarily," but to imply
the doing of an act with a bad purpose.—*Common-
wealth v. Kneeland,* 20 Pick. (Mass.) 206. In *Folwell
v. State,* 49 N. J. Law, 33, 6 Atl. 620, Chief Justice
Beasley approved the Massachusetts case, adding:
"When a statute prohibits an act if done intentionally,
without to such inhibition any words being added
indicating that to render the forbidden act criminal it
must be the product of an evil mind, it becomes a pure
question of statutory construction whether or not the
animus of the person inculpated is an element of the
crime." His conclusion was that the nature of the thing
prohibited must be looked to in determining the inten-
tion of the lawmaker. In the previous case of *State v.
Cutter,* 36 N. J. Law, 125, the same learned judge had
expressed himself more fully along that line. In that
case the defendant, a justice of the peace, was indicted
for extortion in taking fees to which he was not en-
titled. It was argued there, as it is here, that the stat-
ute was explicit in its terms and should be enforced
without regard to the intent of the recipient of unlaw-
ful fees. To this the Chief Justice responded: "Such
undoubtedly is the literal force of the language, but
then, on the same principle, the officer would be guilty

if he took, by mistake or inadvertence, more than the sum coming to him. Nor would the statutory terms, if taken in their exact signification, exclude from their compass an officer who might be laboring under an insane delusion. Manifestly, therefore, the terms of this section are subject to certain practical limitations. This is the case with most statutes couched in comprehensive terms. * * * In morals it is an evil mind which makes the offense, and this, as a general rule, has been at the root of criminal law. The consequence is that it is not to be intended that this principle is discarded merely on account of the generality of statutory language. It is highly reasonable to presume that the lawmakers did not intend to disgrace or to punish a person who should do an act under the belief that it was lawful to do it. And it is this presumption that fully justifies the statement of Mr. Bishop, 'that a statute will not generally make an act criminal, however broad may be its language, unless the offender's intent concurred with his act.'—1 Crim. Law, § 80." Our conception is, however, that the definitions of these cases, though instructive and helpful, are not necessarily controlling one way or the other in the case at bar.

"Willful neglect," being one of several grounds of removal from office, must be interpreted in connection with the other grounds with which it is associated in the Constitution, which are also made causes of impeachment. Those other grounds are: Corruption in office; incompetency; intemperance in the use of intoxicating liquors or narcotics to such an extent, in view of the dignity of the office and importance of its duties, as unfits the officer for the discharge of such duties; any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith. Speaking of these causes of removal from office, Judge

Somerville said in *State v. Savage,* 89 Ala. 1, 7 South.
7, 183, 7 L. R. A. 426 : "They all tend, more or less, to
reflect upon the dignity of office, to generate disrespect
for the law, through the want of worth, moral or intel-
lectual, in the officer, to create dissatisfaction among
the people with their government, and to thus serious-
ly cripple the administration of justice in all its de-
partments." The views there expressed are worthy of
serious consideration. They seem to us to be sound and
just. They point to the conclusion that neglect of offi-
cial duties, to be willful, to authorize forfeiture of office,
must be characterized by a certain moral or intellect-
ual quality different from that implied in the mere in-
tentional doing, or failing to do, an act. The implica-
tion is of a different and more enduring status of the
mental or moral faculties. There seems to be required
such a determined, perverse, and obstinate neglect of
official duty as will authorize an inference and finding
that defendant is so morally or intellectually constitut-
ed as to be unfit for the duties of a public office. No
doubt there are cases in which sufficient ground for
such conclusion and for impeachment may be found in
the proof of a single act of commission or omission.
An occasion calling for the performance of official duty
may be of such great public importance, the duty itself
so undeniable and so morally urgent, conditions so in-
sistent, as to justify and require removal from office on
proof of a single act or omission; and, of course, re-
peated legal sins of commission or omission will fur-
nish evidence of unfitness. Our conclusion is that the
Constitution does not intend that proof of an isolated
technical violation of law shall inflexibly require a judg-
ment of impeachment; that the willful neglect of which
it speaks means more than the merely intentional omis-
sion of an act of public duty; that, to justify removal

from office, it must appear that the incumbent is morally or mentally unfit; that unfitness is an inferential fact to be found by the jury which the Constitution guarantees in the cases of officers impeachable in the circuit or other court of like jurisdiction.

Our common observation of the administration of governmental affairs establishes the fact, and due cognizance of it cannot be avoided, that some duties put upon public officers are of so little relative consequence that their neglect in ordinary times attracts no attention. Though not in accord with the legal theory that all men know the law—a theory very necessary for some purposes—it is also a fact that capable, careful, and conscientious officers may be unacquainted with provisions that may be tucked away in the corners of obscure statutes. And statutes are not infrequently framed so dubiously, they often deal with matters of such intrinsic difficulty, that anxious and intelligent officials cannot know what they mean until the courts have declared their meaning. We think the statute defining the duties and responsibilities of the defendants in this case may not unfairly be said in some of its provisions to furnish an example of this fact. For these reasons administrative and executive officers, who are not required or expected to be learned in the law, continually resort to counsel for advice in the discharge of their duties. Indeed, it is not difficult to conceive cases in which a failure to do so would be accepted by the common understanding as evidence of negligence or inefficiency.

Recurring to Chief Justice Beasley's opinion in *State v. Cutter, supra,* it was argued for the prosecution in that case, as it is here, that as the fees to which the justice was entitled were fixed by law, his guilty knowledge was undeniable. But the court said: "The argument

[Nelson, et al., Jury Coms. v. State, ex rel. Blackwell.]

goes upon the legal maxim, Ignorantia legis neminem excusat. But this rule, in its application to the law of crimes, is subject, as it is sometimes in respect to civil rights, to certain important exceptions. Where the act done is malum in se, or where the law which has been infringed was settled and plain, the maxim, in its vigor, will be applied; but where the law is not settled or is obscure, and where the guilty intention, being a necessary constituent of the particular offense, is dependent on a knowledge of the law, this rule, if enforced, would be misapplied. To give it any force in such instances would be to turn it aside from its rational and original purpose and to convert it into an instrument of injustice. The judgments of the courts have confined it to its proper sphere. Whenever a special mental condition constitutes a part of the offense charged, and such condition depends on the question whether or not the culprit had certain knowledge with respect to matters of law, in every such case it has been declared that the subject of the existence of such knowledge is open to inquiry, as a fact to be found by the jury."

The Constitution, in providing for the removal of unfit officers, proceeds to ends more in accord with the dictate of natural justice and along broader and more liberal lines than do strict and often harsh criminal statutes which prescribe punishment for every transgression of the law. Accordingly, we are clear to the conclusion that whatever might be said in the case of a prosecution under the criminal provisions of the Jury Commission Act, and however an overruling public policy and necessity might conclude the commissioners in some contingencies against saying they did not know the law and had been advised by counsel, if defendants in this impeachment proceeding fairly stated the facts of their situation to legal advisers of good repute for

character and learning, and acted in pursuance of their advice, they should have been allowed to offer evidence of that fact, not as conclusive of the case, but as illustrative and pursuasive of the moral and intellectual qualities of their conduct in doing or failing to do things charged against them. That course would have promoted the constitutional purpose and would have fallen within approved rules of evidence.

An inspection of the record will show that in several particulars the trial court failed to observe the principles which should have governed the case. The judgment of impeachment will be reversed and the cause remanded.

Reversed and remanded.

All the Justices concur except DOWDELL, C. J., not sitting, and McCLELLAN, J., who dissents.

McCLELLAN, J.— (dissenting.)—I am unable to agree with the majority in their interpretation of *willful neglect of duty,* and therefore dissent without reference to other questions decided on this appeal. On the trial of the impeachment charges against the sheriff of Hale county (styled *State of Alabama, ex rel. Attorney General v. William Martin,* 180 Ala. 458, 61 South. 491), it was necessary to interpret *willful neglect of duty* as employed in section 173 of our Constitution. After as thorough an investigation and consideration of this inquiry as I could bestow, my conclusion was that *willful neglect of duty,* as there employed, was this: "An intentional failure or omission of an officer to perform a plain and manifest duty which he is able to perform when he omits to do so." After still further consideration of this matter of particular inquiry, my conviction of the meaning of the phrase remains as previously expressed. As I read them there is no judicial

deliverance in this state inviting or supporting an interpretation of the phrase, used in the organic law, opposed to the interpretation quoted above. The individual view expressed by Justice H. M. SOMERVILLE in *State, ex rel. v. Savage,* 89 Ala. page 11, 7 South. 185, 7 L. R. A. 426, if accepted as both sound and of an authoritative nature, cannot, in my opinion, be accorded a meaning or effect to invite the ruling that the phrase under view comprehends a bad or evil motive or intent as a condition to guilt of its violation. Our learned elder was there, without any inappropriateness, only indulging in comment and observation, not in interpretation of the phrase here involved and not in decision of its meaning or effect. However, to my mind, the "want of worth moral or intellectual," of an officer is strikingly manifested, with the results our elder there well describes, when he intentionally—in necessary violation of his oath and of his duty—fails or omits to perform a plain and manifest duty which he is then able to perform.

In addition to the pertinent considerations adverted to in my opinion in the case of the Sheriff of Hale County, ante, which seem to me to be entitled to influence and effect in attaining a conclusion in the premises, it appears that if this cause for impeachment, *willful neglect of duty,* is interpreted as comprehending evil or bad motive or intent in not observing a plain and manifest duty, and so requiring the establishment of that element in order to make out a case of *willful neglect of duty,* one result would be to make the cause *willful neglect of duty* cover, at least in a large degree, another of the causes, viz., *corruption in office,* as the controlling word in that phrase has been defined by eminent jurists and textwriters. See *Wight v. Rindskopf,* 43 Wis. 344, 351; *C. City Ry. Co. v. Olis,* 94 Ill. App. 323; 10 Cyc.

p. 1368. And a like observation may be made with respect to suggestions which would seem to translate *willful neglect of duty* into the domain of *incompetency,* as that cause of impeachment is defined in *State, ex rel. v. Lowe* (in MSS.). See, also, *State, ex rel. v. Latham,* 174 Ala. 281, 61 South. page 352, second column. The several causes enumerated in section 173 are not, in my opinion, intended to overlap or supplement each other. Each is distinct.

It seems to me that to interpret *willful neglect of duty* as requiring, as a condition to guilt thereof, the then entertainment by the officer of a bad or evil motive or intent in not observing a plain and manifest duty, is, necessarily, to establish a standard against the public policy that is the immediate outgrowth of public necessity; and to surround officers, even confessing an intentional failure to perform a plain and manifest duty, with such a large degree of practical immunity from removal for *willful neglect of duty* that I cannot believe was the intent of the makers of the present Constitution and of its predecessors. The ascertainment of the standard the organic writers established in providing for removal from office of the officer who willfully neglects a plain and manifest duty cannot, in my opinion, be soundly or wisely affected by any degree of common knowledge (if such there be) that officers do not perform their plain and manifest duties or that some plainly exacted duties are of trivial consequence.

If these factors (if they exist) are given such an effect in interpreting the organic law in the particular under view, the consequence, as I see it, is to not only clothe officers with a practical discretion above positive law establishing their duties, but to qualify the exaction of the best service by officers and thus oppose what seems to me to be a manifest public policy that is the

[Burch, et al. v. Gaston, Judge.]

immediate product of public necessity—a condition in opposition to which I cannot conceive the makers of the Constitution intended to provide.