# State *ex rel.* Attorney-General v. Robinson.

### *Impeachment Proceeding.*

1. *Impeachment proceedings; criminal in its nature and governed by criminal rules.*—Impeachment proceedings in the Supreme Court under Article VII, sections 2 and 3 of the Constitution of 1875, providing for the removal by the Supreme Court of certain State officers for specified causes, are criminal in their nature, and are governed by the rules of law applicable to criminal cases; and the respondent in such proceeding can not be adjudged guilty as charged until his guilt is established by the evidence beyond a reasonable doubt.

2. *Habitual drunkenness; what constitutes it.*—Habitual drunkenness can not be predicated of one who occasionally drinks to excess. But if a person is repeatedly drunk, at intervals, whether regular or irregular, for such a length of time as that it can be predicated with reasonable assurance that he will continue to get drunk, and that it has become the rule or habit of such person to drink to intoxication whenever occasion offers an opportunity, and sobriety is the exception with such person, he is then guilty of habitual drunkenness.

3. *Impeachment for habitual drunkenness; when charge not proven.*—Where, on impeachment proceedings in the Supreme Court against a probate judge, based on the charge of habitual drunkenness, the evidence for the State shows that the respondent had, on several occasions, during the term of his office, been drunk, but such times of intoxication were occasional, and the evidence for the defense was that sobriety was the respondent's rule of conduct and drunkenness was

[State *ex rel.* Attorney General v. Robinson ]

the exception, and it was further shown that he had not neglected the duties of his office, the charge of habitual drunkenness is not sustained, and the respondent is entitled to an acquittal.

This was an impeachment proceeding commenced in the Supreme Court upon information filed by the Attorney-General upon a written order of the Governor charging the respondent, William C. Robinson, judge of probate of the county of Lee, in the State of Alabama, with, first, habitual drunkenness; second, willful neglect of duty; and third, incompetency; upon which charges it was sought to impeach the said William C. Robinson, and to remove him from the office of judge of probate of the county of Lee.

To each of these charges the defendant pleaded not guilty. The evidence was taken before a commissioner by deposition. The facts disclosed by these depositions, after their publication, are sufficiently stated in the opinion.

WILLIAM C. FITTS, Attorney-General, and THOS. G. JONES for the State. The facts of this case show that the respondent was guilty of habitual drunkenness.— *State v. Savage,* 89 Ala. 1; *Tatum v. State,* 63 Ala. 152; Black on Intoxicating Liquors, § 425; *Com. v. Whitney,* 5 Gray 85; *State v. Pratt,* 34 Vt. 223; *Com. v. Alexander,* 1 and 2 Virginia Cases 156; *Com. v. Mann,* 1 and 2 Virginia Cases 308.

J. M. CHILTON and A. & R. B. BARNES, for the respondent.—In this State it has been determined that an impeachment proceeding is strictly criminal in its character; even to the extent that the State must prove the charge upon which the proceeding is based beyond a reasonable doubt.—*Ex parte Buckley,* 53 Ala. 42; *State v. Seawell,* 64 Ala. 255; *State v. Tally,* 102 Ala. 25.

The evidence as adduced on the hearing of this cause was not sufficient to show that the respondent was guilty of habitual drunkenness, as defined by the rule laid down in decisions of this court.—*Tatum v. State,* 63 Ala. 147; *Smith v. State,* 55 Ala. 1; *Savage v. State,* 89 Ala. 1.

HARALSON, J.—Under the present constitution of the State, the Governor, Secretary of State, Auditor, Treasurer,

Attorney-General, Superintendent of Education, and Judges of the Supreme Court, may be removed from office for willful neglect of duty, corruption in office, habitual drunkenness, incompeteney, or any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith, by the Senate sitting as a court for that purpose, under oath or affirmation, on articles or charges prepared by the House of Representatives.—Const. Art. VII, § 1.

All other State officers, from the judges and chancellors down to and including mayors and intendants of incorporated cities and towns may be removed for any of the causes specified in the foregoing article and section, by the courts of the country,—the chancellors, judges of the circuit courts, judges of the probate courts, solicitors of the circuit courts, and judges of the inferior courts, are removed by the Supreme Court, and all the other State officers by the circuit, city or criminal court of the county, under such regulations as may be presented by law —Const. Art. VII, §§ 2 and 3, Code, §§ 4818–4831.

As to those officers impeachable by and before the courts, the proceeding is strictly judicial. Whatever may be the rules of procedure of the Senate, sitting as a court for the trial of an impeachment case, as to those officers now or formerly triable before that body, it is certain that in the trial of an impeachment cause by a court of justice, in any of those cases now committed to the judicial department for trial, the court proceeds to make strict judicial investigation, according to judicial methods. Such proceedings are criminal in their nature, and are governed by the rules of law applicable to criminal causes. Before a defendant can be convicted, it is incumbent on the State to prove his guilt, to the satisfaction of the court beyond reasonable doubt. The constitutional and statutory provisions on the subjuct, are to receive strict construction.—*Ex parte Buckley*, 54 Ala. 559; *The State v. Seawell*, 64 Ala. 228; *The State v. Tally*, 102 Ala. 25.

*Habitual drunkenness*, specified as such for the first time in the constitution of 1875, as one of the grounds of impeachment of a public officer, applies alike to all public officers, from the governor and judge to the constable and intendant of an incorporated city or town. In

a court of justice, for such as are there triable, no distinction is or can be made in the application of the rules of law for the impeachment of the one, that does not apply with equal force to any other officer. The dignity of the office of the incumbent proceeded against, makes no difference, and a court will not hold a chancellor, judge of the circuit or city court, or a judge of the probate court, to a stricter account, than it will a constable, or an officer of the lowest grade, mentioned in the constitution and statute, for any of the impeachable offenses therein specified. These officers from the highest to the lowest are all mentioned together, as being amenable alike for any of the designated offenses. As said by Judge Story, it is not compatible with the genius of our institutions, to make that a crime at one time, or in one person, which would be deemed innocent at another time or in another person.—1 Story on Constitution, § 797; *The State v. Hastings,* 37 Neb. 115.

It is observable that the constitution does not specify *drunkenness* in a public officer as a cause of removal from office, but among others is specified the offense of "*habitual drunkenness.*" We must presume that the framers of the constitution in employing these words, intended to use them in their ordinary legal signifiication, and to draw a distinction between drunkenness that was casual or occasional, and that which had become fixed, as habitual. It has been truly said, that it is difficult to draw the line of distinction between these two conditions to which one may become addicted. In *The State v. Savage,* 89 Ala. 8, this court attempted a definition of habitual drunkenness,—as nearly correct, perhaps, as can be given,—as follows : "*Drunkenness* is that effect produced on the mind, passions or body, by intoxicants taken into the system, which so far change the normal condition, as to materially disturb and impair the capacity for healthy, rational action or conduct; which causes abnormal results, or such as would not ensue in the absence of intoxicants,—the changed effect produced by the immoderate, or excessive use of intoxicants, as contrasted with normal *status* and conduct. *Habit* is customary state, a disposition acquired by frequent repetition ; aptitude by doing frequently the same thing ; usage, established manner. When a person has repeatedly acted in a particular way, at intervals, whether regular or irreg-

ular, for such length of time as that we can predicate with reasonable assurance that he will continue so to act, we may affirm that this is his habit.''

Again, in *Tatum v. The State*, 63 Ala. 152, it was said: "It need not be the uniform or unvarying rule, but to be a habit, it must be the ordinary course of conduct,—the general rule or custom. It may have exceptions. Exceptions do not destroy a rule. But, unless, when occasion offers, there is a disposition, or probable inclination to drink to excess, intemperate habits cannot be predicated. If sobriety is the rule, and occasional intoxication the exception, then the case is not brought within the statute. On the other hand, if the rule or habit is to drink to intoxication when occasion offers, and sobriety or abstinance is the exception, then the charge of intemperate habit is established.'' What is here said, seems to cover the general consensus of authority on the subject.—*Stanley v. The State*, 26 Ala. 26; *Smith v. The State*, 55 Ala. 10; *Ludwick v. Commonwealth*, 18 Penn. St. 172; *State v. Pitt*, 34 Vt. 223; *N. W. Ins. Co. v. Muskegon Bank*, 122 U. S. 507; Black on Intoxicating Liquors, § 425.

The charge against the respondent is, that he has, since the commencement of his term of office as judge of probate, and before the day the Governor gave his direction to the Attorney-General to commence this prosecution, to-wit, the 12th of April, 1895, been addicted to the use of ardent spirits, and has been guilty of habitual drunkenness.

It remains for us to inquire, whether or not, under the evidence taken and submitted, when applied to the rules of law above stated, the respondent is guilty as charged. There have been one hundred and fifty witnesses examined by deposition, sixty-five by the State, and eighty-five by the respondent. Their testimony covers about 550 pages, and has taken a wide range. The State went back to 1880, at the time respondent was elected clerk of the circuit court of Lee county, and has sifted his habits in respect to the use of intoxicating beverages, from that time till this prosecution was instituted.

It may be sufficient to say as to the proofs tending to show his habits between 1880 and 1889, that up to the latter date, at some of the intervening time, he was ad-

[State *ex rel:* Attorney-General v. Robinson.]

dicted to the occasional intemperate use of liquors, and sometimes drank to intoxication, but the proof is wholly lacking to show that he was an habitual drunkard. For five or six years of that time, it reasonably appears, he did not drink at all. In 1886, after having served six years as circuit clerk, without any complaint, so far as disclosed, against the faithful performance of his official duties, he was elected to the office of judge of probate of the county. From 1889 to 1892, he seems to have indulged more frequently. In the former year he went to Phœnix City for the purpose, with the judge of Russell county, of establishing the line between Lee and Russell counties, and while there, on the invitation of his friend, after several years of total abstinence, he was induced to indulge, as he admits, too freely. On his way home, he was invited by a party into the baggage car to take a drink, which he did, and by a repetition of drinks he was very intoxicated on his arrival at Opelika, when he went to the hotel and spent the night instead of going to his own home. Quite a number of witnesses have been examined touching this occurrence, and much stress has been laid on it, as a criminating circumstance.

At the November election, 1892, after he had served one term, and after all these occurrences, he was reelected by the people to the same office.

There are several occasions of alleged drunkenness, made prominent and much referred to in evidence and in argument, which may be well to dispose of, preliminary to a consideration of the other charges. It is said, he was intoxicated on the night of the presidential election in 1892, and the State examined three witnesses, Gorman, Hurst and Driver, who swore to the fact. But these witnesses were evidently mistaken, for the respondent has shown, by eleven witnesses examined by him, that it is as certain as anything can be established by human evidence, that he was not drinking or drunk on this occasion. Some of them were with him almost constantly during the day, and many of them at night when he was at the telegraph office, and one of them, who lived beyond him on the same street, went with him as far as his house, at 11 o'clock, and all of them swear he was sober and not drinking. One of these witnesses says, there was great noise and excitement, and the whole town acted a good deal like it was drunk. This

fact may serve to explain the mistake into which the State's witnesses fell, as to respondent's condition on that occasion.

It is charged further, that he was intoxicated on the 7th of November, 1892, at the opening of the Fall term of the circuit court, and several of the State's witnesses swear in a manner tending to show this fact; but it is fully disproved by *twenty* of the respondent's witnesses. On that day, and on the 8th and 9th of the month, the commissioners' court is shown to have been in session, and respondent was there, presided during the meetings, and was altogether free from liquor. In the face of this proof to the contrary, one is bound to conclude that the charge is a mistake.

An attempt was made to show that he was seen at the cemetery gate, on the public road, in a besotted condition and indecently exposed, and a witness swore to the fact. But it was abundantly developed in evidence, that this witness was mistaken, that the man he saw was another person, who was afterwards picked up and cared for.

On November 18th, 1892, it is charged he was intoxicated at a circus. The main witness by whom this fact is sought to be established, who was with respondent at the circus, is shown to have been, himself, very much intoxicated during the evening at the performance. Another witness, however, does depose that he saw respondent, and he was intoxicated. The respondent does not deny that he drank some that night, but says it was before going to the exhibition.

Still another occasion was at Union Springs,—about February 1, 1895;—where he was arrested and fined for being drunk and disorderly. He pleaded guilty and asked the court to make its fine a light one, which was done. The evidence we think fully established this alleged deflection. He denies that he was intoxicated, and says that he was there about matters pertaining to his election to Congress, which was being disputed; that there was much excitement on the subject, and he pleaded guilty as the shortest way to get out of the alleged offense, through fear of something worse.

It seems to be well established, that on the 29th August, 1893, on the occasion of the visit of J. A. Reeves, the public accountant, to Opelika, to examine respond-

ent's report of the hire of convicts, respondent was intoxicated and behaved in an offensive manner to that officer.   He was seen by many persons, and frequent reference is made to this occasion .by a number of the witnesses.

When one reads the evidence of the witnesses for the State he would be impressed that the charge preferred, has been made out against the respondent.   There is such an array of these witnesses, nearly all of them deposing to· the drinking and intoxication of respondent, that the mass of evidence serves, without scrutinizing it closely, to make that impression.   When subjected to careful consideration, however, it becomes manifest that many of the alleged departures of respondent from sobriety, are but the same instances testified to by other witnesses ; or, in other words, that many witnesses testify to the same criminating fact, with such indefiniteness of time and place, as might seem to make many occurrences of the .same kind, when. really they saw and testified to but one occasion.   If considered as separate occasions, the great number of them, as would appear, deposed to by so great a number of witnesses, would be strongly criminative ; much less so, however, when by comparison of dates and other circumstances, it reasonably appears, that the evidence relates to a few and not to many occasions.   Many of the witnesses do not pretend to give dates or localities, but say, generally, that they saw respondent intoxicated several or a few, or many times.   From the best analysis we have been able to make of the evidence of the State's witnesses as to the occasions they have seen respondent intoxicated since his term began,—November 1, 1892,— it seems there were about thirty-nine of them who depose to time and place more or less definitely, when they say they saw respondent intoxicated.   Twenty-six of these depose to one time, seven of them to two, two to three, two to four, one to five, one to six times, making the thirty-nine occasions, when witnesses testify they saw him in this condition.   These times, then, in arriving at the real number of separate occasions when he was thus seen, are to be diminished by the fact that a number of them,—how many the evidence does not furnish a sufficient clue to determine,—are the same occurrences.   When thus diminished, stretching over a period

from November, 1892, to the time of the taking of the testimony, the occurrences became apparently occasional. Every witness who testified against him, as will be seen from what has been said, testified to isolated instances of intoxication, and not one of them, that he was a man of intemperate habits. The State propounded no question to any witness, competent to testify as to the fact, whether he was a man of temperate or drunken habits.

These witnessses, from what appears, let it be added, were from different classes of representative citizenship, and fully entitled to credit in having testified honestly and fairly on the trial, to what they believed to be true. We have no occasion to reflect on the character and truthfulness of any of the witnesses on either side.

On the other side, the respondent has called witnesses from almost every vocation, many of them evidently, among the most substantial citizens of the county,—men who have long known and been intimately acquainted and associated with him, and who from their frequent observation of his conduct, were well acquainted with his habits and character. Of these eighty-five, twenty-three testified as to his general life, that he was a man of temperate, or sober, and not drunken habits ; and two of the State's witnesses, on cross-examination, made the same declaration. All the others for the defense, if their evidence is to be trusted, swear also to a state of facts making it impossible for him to have been habitually intemperate, and force the conclusion that his deflections were exceptional, rather than habitual. These witnesses, like those of the State, were from the different classes and avocations, and, as we take it, were equally fairly representative in character.

When the information was filed, it included willful neglect of official duty, and incompetency. After the evidence was taken, these grounds were abandoned, and the State relied solely on the charge of habitual drunkenness. It does not appear that respondent was guilty of either of the abandoned charges. He seems to have been attentive to his business. No complaints are brought to light in the evidence against his administration of the affairs of the office, with the exception of a failure on a few occasions on account of being under liquor to try promptly criminal cases brought before him, and these are not established with that degree of cer-

tainty, if we were trying him for them, as would proba-
bly authorize us to say he was guilty of the charges.

One of the county commissioners, swearing to his at-
tentiveness to business, and his freedom from intoxicants
generally, states that at one time only, during his term,
did he see him at all under the influence of liquor.

Taking all these things together, then, and giving due
weight to all that the witnesses for the State have testi-
fied against him,—very truthfully, no doubt, as they
understood the facts,—what are we to conclude?   Here
is a man repeatedly trusted and elected to office by the
people of his county, notwithstanding these charges
against him.   He is surrounded by a great cloud of wit-
nesses, examined in his behalf, who are citizens of
the city and county in which he resides and performs
his official duties, and who cannot be said, from any-
thing appearing, to have been biased in his favor, who
testify either, that he is a man, generally, of sober and
not of intemperate habits, or to facts, which, if true,
leave no reasonable doubt on that subject.   He is not
shown to be incompetent or unfaithful as a result of in-
temperance, which would almost certainly have been the
case, if guilty of habitual drunkenness.   That he has
been guilty of intemperance to a degree discreditable to
himself and the office he fills, cannot be doubted; but,
that he is an habitual drunkard, we are not permitted
from the evidence to believe.   The constitution and laws
of the State do not authorize removal from office for any
intemperate indulgence in intoxicants, short of "habit-
ual drunkenness."   Our judgment is, that this charge
against respondent is not sustained by the evidence.

Judgment for respondent.