66 So.2d 105

### STATE ex rel. MULLIS et al. v. MATHEWS.

#### 4 Div. 701.

Supreme Court of Alabama.

Jan. 19, 1953.

On the Merits June 13, 1953.

Walker & Walker, Opelika, Smith & Smith, Phenix City, and Lawrence K. Andrews, Union Springs, for respondent.

Brown & McMillan, Opelika, for informants.

Pitts & Pitts, Selma, and Baldwin & Baldwin, Andalusia, amici curiae.

PER CURIAM.

This is an impeachment proceeding originally commenced in this Court by the filing of an information by E. E. Mullis and four other individuals in their own behalf and in the name of the State of Alabama on their relation, wherein they aver in twenty-four specifications that the respondent, H. Ralph Mathews, Jr., Sheriff of Russell County, is guilty of willful neglect of duty.

There is no charge of the other constitutional grounds of impeachment, viz., corruption in office, incompetency, intemperance or an offense involving moral turpitude. The information alleges that E. E. Mullis and the four other individuals are resident taxpayers of Russell County, Alabama. It is signed "State of Alabama, on the information of," followed by the signatures of the five individuals, who sign their names followed by the description, "Individually, as resident taxpayers of Russell County, Alabama." The information is also signed "Brown & McMillan, Counsel for Informants." No one purports to sign the information as counsel for the State of Alabama. The Attorney General of the State has not signed his name to the information and he has not in any way appeared in this case to prosecute the case on behalf of the State. Private attorneys, as counsel for the individual taxpayers, appear on behalf of the plaintiffs, the State and the taxpayers, to prosecute this cause.

The information in this case is filed under the apparent authority of Code 1940, Title 41, sections 181 and 182. By the pleadings, it is the insistence of defendant (1) that this statute does not authorize private counsel to sign or prosecute such an information on behalf of the State, and that if it does so such provision of the statute is unconstitutional; and (2) that said statute is unconstitutional in so far as it attempts to confer on private citizens or their attorneys authority to file or prosecute in the Supreme Court a constitutional impeachment proceeding in their names jointly with the name of the State, or otherwise. It is also insisted by the defendant that the several specifications of the information do not state grounds of impeachment.

The insistence of counsel for respondent is that section 181, Title 41, Code, under which the information was instituted, is unconstitutional and violative of sections 8 and 170 of the Constitution of 1901.

The authority to impeach the sheriff is under section 174 of the Constitution for the causes set forth in section 173. It must be done by original proceedings begun in this Court. The legislature is directed to make provision for such an impeachment.

Section 174, supra, is not self-executing but it is necessary for the procedure to be enacted by the legislature. State ex rel. Attorney General v. Buckley, 54 Ala. 599. The legislature has done so. This now appears in Article 2, Title 41, beginning with section 178, Code. Sections 180, 181, 182 and 201, Title 41, Code, apply more directly to the questions here presented.

Section 180, supra, authorizes proceedings under sections 174 and 175 of the Constitution (this includes sheriffs) "in the name of the State of Alabama, in the nature of an information, by the attorney general, or solicitor, or *upon the information of such other persons as are by this chapter allowed to institute the same*; and all such proceedings shall be conducted, and all process shall issue, in the name of the State of Alabama."

Section 181, supra, provides that "Any five resident taxpayers of the * * * county * * * for which the officer sought to be impeached was elected or appointed, may institute proceedings of impeachment, under either of the sections of the constitution above expressed (174 and 175), upon giving bond" for the costs.

Section 182, supra, contains requirements as to the contents of the information, "and shall be signed by the attorney general, or solicitor, *or by counsel*, as the case may be; and when such information is by taxpayers, the names of such taxpayers must be joined as plaintiffs with the state."

Section 201, supra, makes it "the duty of the attorney general to institute proceedings under this chapter, and prosecute the same against any officer included in section 174, article 7, of the constitution (including sheriffs), when the supreme court shall so order, or when the governor shall, in writing, direct the same, or when it appears from the report of any grand jury", etc. The solicitor may institute the proceeding when it is begun in the circuit court under section 175, Constitution.

An impeachment proceeding under section 174 of the Constitution is a criminal prosecution. State ex rel. Attorney General v. Buckley, 54 Ala. 599; State ex rel. Attorney General v. Tally, 102 Ala. 25, 15 So. 722; State ex rel. Attorney General v. Rob-

inson, 111 Ala. 482, 484, 20 So. 30; Batson v. State, 216 Ala. 275, 113 So. 300; State ex rel. Knight v. deGraffenried, 226 Ala. 169, 146 So. 531.

Section 8 of the Constitution provides in substance so far as here material that no person for an indictable offense shall be proceeded against criminally by information except as noted, the exception including misdemeanors when so authorized by the legislature.

Section 170 of the Constitution provides that "The style of all processes shall be 'The State of Alabama,' and all prosecutions shall be carried on in the name and by the authority of the same, and shall conclude 'against the peace and dignity of the state'."

It was said in the Buckley case, supra, that impeachment proceedings fall in the class of criminal prosecutions, mentioned in what is now section 8 of the Constitution, which do not require an indictment. On page 620 of 54 Ala. of the opinion it refers to section 7 of the Bill of Rights of the Constitution of 1875 in this connection, but it is evidently referring to section 9, and it places impeachment proceedings in the same class with criminal prosecutions which may be begun by authority of law without an indictment. There is nothing in section 8 which is contravened by section 181, supra, or by the instant proceeding.

Section 8 of the Constitution authorizes the legislature to make provision for the institution of prosecutions and proceedings in cases of misdemeanor without an indictment, which the legislature has done as manifested by section 327, Title 13, Code.

It is also contended that section 181, supra, violates section 170 of the Constitution, to which we have referred. This proceeding is required to be and it is styled in the name of the State of Alabama and prosecuted by its authority, sections 180 and 181, Title 41, Code, section 170, Constitution, and concludes "against the peace and dignity of the state" see, Thomas v. State, 107 Ala. 61, 64, 17 So. 941, and therefore, it does not violate section 170 of the Constitution.

It is also contended that sections 180 and 181, supra, do not authorize five private individuals either to institute or conduct such a proceeding by the use of private counsel employed to do so without the authority of the attorney general.

It is admitted in this case that the relators being five resident taxpayers employed private counsel without the authority of the Attorney General, and that it is proposed to conduct this proceeding in this Court by such private counsel without such authority in derogation of the power of the Attorney General to control the same.

While section 181, supra, has been in the Code for a long time, not much use has been made of it. The case of State ex rel. Johnson v. Lovejoy, 135 Ala. 64, 33 So. 156, is the only reported case which we have observed in which the authority of that statute was exercised. The report of that case and its record in this Court do not indicate that any question was raised as to its conduct by privately employed counsel or the constitutionality of said statute. The original record of the case gives no indication that the attorney general participated or that there was objection because he did not participate or authorize private counsel to conduct such proceedings. It shows that a demurrer to the information was sustained on the ground that it did not conclude "against the peace and dignity of the state". It was then amended in that respect. There was a judgment entered, finding that the charges were not proven beyond a reasonable doubt and, therefore, that respondent be discharged on that account. We think that case is not persuasive in reference to the question involved either for or against the contention of respondent in this case.

Our records also show that on June 8, 1904, an information in the name of the State of Alabama on the relation of five named resident citizens and taxpayers of Lowndes County was filed in this Court for the impeachment of J. Carlton Wood, Judge of Probate of Lowndes County, Alabama. It was signed by Alexander D. Pitts and Pettus and Jeffries, designating themselves as "attorneys for the State of Alabama on the relation of said relators," and security for costs was given. The Court thereupon

made an order setting the impeachment proceeding down for hearing. An amendment to the information was filed, which was signed by the same counsel and in the same capacity as the original information. This amendment added many specifications to the charge. Neither it nor the original showed that the attorney general participated in or authorized the proceeding or that there had been any order made for the proceeding either by the Supreme Court, the governor or the grand jury. The minutes of the Court show that said amendment was allowed by order of the Court. There also appears on the minutes of the Court a judgment which denied and overruled the motion by the respondent to quash the information as amended and to strike separately and severally the specifications numbered in said information and in the amendment thereto, and the charge upon which the specifications are based, and which also overruled the demurrers of the respondent to the information as amended and separately and severally to each specification of the same. The record does not show upon what grounds the motion to quash or to strike, or the demurrer, was based. So that, we do not know whether those motions and the demurrer raised the questions which are presented in the instant case. The record further shows that after said motions and demurrer were overruled, the respondent resigned as probate judge of Lowndes County and the proceeding was abated. So that, the proceedings in that case and the rulings made in it, like the Lovejoy case, supra, are not decisive of the case here involved.

Our records also show that on June 9, 1916, an information was filed in this Court against Pal M. Daniel as sheriff of Russell County. State ex rel. Attorney General v. Daniel, 196 Ala. 704, 72 So. 1020. The information was in the name of William L. Martin, attorney general, prosecuting in the name of and for the State, and also a large number, much more than five, persons who declare that they join as plaintiffs in the action, and that they are resident taxpayers of Russell County, and appear under the law and statutes of the State as plaintiffs. Neither the information nor any other fea-

ture of the proceedings indicates that the attorney general was ordered to file the information by the Supreme Court, the governor or a grand jury report. The proceedings do not show that security for costs was given by the resident taxpayers named. To be supported by section 181, supra, as in the instant case, it was necessary for the taxpayers to give security for costs. As we have said that failure does not appear to have been presented to the Court by the respondent in the Daniel case, supra. So that, there is nothing in that status which we think would have any influence upon the questions here involved. It is noted, however, that a demurrer to the information on the ground that it did not conclude "against the peace and dignity of the state" was sustained and the information was amended so as to do so.

It is our view that five resident taxpayers may institute an impeachment suit in this Court upon complying with sections 181 and 182, supra, and that the information required to be filed in doing so may be upon their relation, as authorized by section 180, supra.

Referring now to the insistence made by respondent that although an impeachment against the sheriff may be instituted by five taxpayers in the name of the State, as authorized by sections 180 and 181, supra, it cannot be prosecuted by private counsel employed by relators, but must be prosecuted by or under the direction of the attorney general.

It is also our view that the legislature may not only authorize an impeachment to be instituted as in section 181, supra, but may authorize it to be prosecuted by private counsel. Section 170, Constitution, requires it to be carried on in the name and by authority of the State of Alabama. When the legislature authorizes it to be done in the name of the State, and prosecuted by privately employed counsel, the prosecution will thereby be conducted by authority of the State. The legislature exercises all the powers of the State, and may legislate without restriction except by the Constitution. So that, a prosecution by legislative authority is a prosecution by au-

thority of the State within the meaning of section 170, Constitution.

Construing sections 181 and 182, supra, in connection with other features of the law, we have reached the conclusion that they authorize not only the institution of an impeachment by five resident taxpayers of Russell County, but also authorize them to prosecute the proceeding by such counsel as they wish to employ.

Therefore, the grounds of demurrer, to which we have referred, are not well taken. We have also given consideration to the other grounds of demurrer. We think they have been heretofore considered in other impeachment cases instituted by the same constitutional authority, and have held that they are not well taken. So that, the demurrer to the information and its several charges and specifications is overruled.

In response to the motion to require counsel to show by what authority they appear for the State, we think the showing made is sufficient, and that their appearance for the State is well supported. It is so ordered.

LIVINGSTON, C. J., and BROWN, FOSTER and LAWSON, JJ., concur.

SIMPSON, STAKELY and GOOD-WYN, JJ., dissent.

SIMPSON, Justice, dissenting, in which STAKELY and GOODWYN, JJ., concur.

This is an impeachment proceeding instituted by an information under the apparent authority of Code 1940, Title 41, §§ 180, 181, 182, by five resident taxpayers of Russell County, individually, and in the name of the State of Alabama on their relation and by their private counsel. The representative of the State—the attorney general—takes no part in the case.

The authority to impeach a sheriff is §. 174 of the Constitution of 1901 for the causes set forth in § 173, which must be done by an original proceeding in this court. Section 174 is not self-executing, State ex rel. Attorney General v. Buckley, 54 Ala. 599, but directs the legislature to make provision for such an impeachment. The legislature has sought to do so and the statute

now appears in Article 2, Title 41, beginning with § 178 of the Code.

Section 180 authorizes proceedings of impeachment under §§ 174 and 175 of the Constitution by the duly constituted prosecuting officers of the state "or upon the information of such other persons as are by this chapter allowed to institute the same;" etc. Sections 181 and 182 provide that five resident taxpayers of the county for which the officer sought to be impeached was elected or appointed may, by their own counsel, institute proceedings of impeachment under either of the sections of the Constitution above expressed (174 and 175) upon giving bond for the costs.

Section 182 contains requirements as to the contents of the information, stating that it "shall be signed by the attorney general, or solicitor, or *by counsel*, as the case may be; and when such information is by taxpayers, the names of such taxpayers must be joined as plaintiffs with the state." (Emphasis supplied.)

The defendant by motion and plea in abatement raises the question of the constitutionality of these provisions of the impeachment statute in so far as they attempt to confer on private citizens authority to institute the proceedings and prosecute the case through private counsel. This is a serious question and I have given it serious and prolonged study. I am mindful of the rule of construction before striking down a statute as unconstitutional (to "indulge the presumption that the enactment in question is constitutional, until clearly convinced to the contrary" Zeigler v. South & N. Ala. R. Co., 58 Ala. 594, 596), but have become convinced within the terms of the rule that the provisions of the statute with respect to the matter considered do run afoul of established canons of constitutional construction and cannot stand.

An impeachment proceeding is highly penal in nature and is essentially a prosecution for crime and governed by the rules of law applicable in criminal cases. In order for the defendant to be convicted of any of the accusations charged in the information, the State of Alabama, not private citizens or private counsel, must prove his guilt to the satisfaction of this court be-

yond a reasonable doubt. State ex rel. Attorney General v. Robinson, 111 Ala. 482, 484, 20 So. 30.

And constitutional and statutory provisions on the subject of the procedure in such cases, as in all other criminal cases, are to receive a strict construction in favor of the accused. Nelson v. State, 182 Ala. 449, 453, 62 So. 189.

The rule may be different in some other jurisdictions, many of which hold to the view that such cases are civil or only quasi criminal in nature; but in this jurisdiction this court, from its earliest history, has followed the English common law and consistently held that a proceeding of impeachment is a criminal prosecution against the accused. (Batson's case, infra, should not be construed as indicating the contrary.) Buckley's case, supra, 54 Ala. at page 620; State ex rel. Attorney General v. Tally, 102 Ala. 25, 15 So. 722; State ex rel. Attorney General v. Robinson, 111 Ala. 482, 20 So. 30; State ex rel. Garber v. Cazalas, 162 Ala. 210, 50 So. 296; State ex rel. Attorney General v. Latham, 174 Ala. 281, 61 So. 351; Nelson v. State ex rel. Blackwell, 182 Ala. 449, 62 So. 189; State ex rel. Attorney General v. Hasty, 184 Ala. 121, 63 So. 559, 50 L.R.A.,N.S., 553; Batson v. State ex rel. Davis, 216 Ala. 275, 113 So. 300; State ex rel. Knight v. deGraffenried, 226 Ala. 169, 146 So. 531; State ex rel. Carmichael v. Baggett, 252 Ala. 540, 41 So.2d 584; State ex rel. Moore v. Blake, 225 Ala. 124, 142 So. 418.

With this clear principle embedded in our jurisprudence, the conclusion seems inescapable to me that any statute (without specific constitutional sanction, which we do not have) which seeks to endow private citizens, acting through private counsel, with the sovereign prerogative of prosecuting for crime is a complete non sequitur of the original concept and impinges upon our whole constitutional scheme.

It is axiomatic that only the state acting in its sovereign capacity is the proper party plaintiff in a criminal prosecution. The crime or the offense charged is not one against any individual, although usually the individual may be concerned or is the injured party. It is an offense against the sovereign, the state, and the sovereign alone is the one who prosecutes. Blackstone expresses the concept in his chapter on the King's Prerogative:

"In criminal proceedings, or prosecutions for offences, it would still be a higher absurdity, if the king personally sat in judgment; because in regard to these he appears in another capacity, that of prosecutor. All offences are either against the king's peace, or his crown and dignity, and are so laid in every indictment. For though in their consequences they generally seem (except in the case of treason and a very few others) to be rather offences against the kingdom than the king; yet, as the public, which is an invisible body, has delegated all its power and rights, with regard to the execution of the laws, to one visible magistrate, all affronts to that power, and breaches of those rights, are immediately offences against him, to whom they are so delegated by the public. He is therefore the proper person to prosecute for all public offences and breaches of the peace, being the person injured in the eye of the law. * * *" —1 Blackstone, Ch. 7, 258–259. See also 4 Blackstone, Ch. 1, p. 2.

Such also is the consistent construction in this country.

"An offense which is pursued at the discretion of the injured party or his representative is a civil injury. An offense which is pursued by the sovereign or the subordinate of the sovereign is a crime." Cooley on Torts, Second Ed., p. 96.

"The absolute theory of punishment * * * rests on the assumption that crime as crime must be punished; *punitur quia peccatum est*. But then comes the question, by whom? The State, as representing society at large, springs from a moral necessity. * * * Penal justice, therefore, is a distinctive prerogative of the State, to be exercised in the service and in the satisfaction of the duty of the State, and rests primarily on the moral rightfulness of the punishment inflicted. * * *"

Wharton's Criminal Law, Vol. 1, § 10, pp. 10–11.

"* * * The real distinction between a tort and a crime is to be sought for, not in a difference between their tendencies, but in the difference between the methods by which the remedy for the wrong is pursued, a wrong for which the remedy is pursued by and at the discretion of the individual injured or his representative being a tort, and a wrong for which the wrongdoer is proceeded against by the sovereign or state for the purpose of punishment being a crime." 22 C.J.S., Criminal Law, § 4, p. 55.

Our own cases are consonant with this theory holding that "A criminal prosecution is also defined to 'be a prosecution in a court of justice, in the name of the government, against one or more individuals accused of crime.' * * * The issue is between the government and the prisoner on a question of the guilt or innocence of the latter." Ex parte Pepper, 185 Ala. 284, 293, 64 So. 112, 115; City of Mobile v. McCown Oil Co., 226 Ala. 688, 692, 148 So. 402.

And, of course, it is axiomatic that under our tripartite system of government the executive department is the branch of government which is vested with the authority to prosecute for crime. The legislative branch should not and cannot invade that field without specific constitutional sanction.

The framers of our Constitution, indeed of our several constitutions, must have had in mind this established principle of law when it was ordained that criminal prosecutions must be in the name of and by authority of the state. Section 170 of our present (1901) Constitution so provides in the following language: "The style of all processes shall be 'The State of Alabama,' and all prosecutions shall be carried on in the name and by the authority of the same, and shall conclude, 'against the peace and dignity of the state'."

This is a plain constitutional mandate stipulating that criminal prosecutions shall be carried on by the state in its sovereign capacity, not by private citizens as individuals or as using the name of the state, for in such latter case prosecutions would not be "by authority of the state." This is bound to be the meaning to be accorded the section; otherwise its impotency would be apparent and it should not have been embodied in the Constitution as a part of our organic law.

Authority for sustaining the provisions of the statute seeking to empower private citizens to institute and carry to conclusion a criminal prosecution of impeachment, in disregard of the proper officials who are charged with representing the state in criminal prosecutions, is claimed to be found in that part of § 174 of our Constitution providing for the impeachment of certain constitutional officers, including sheriffs, by the Supreme Court "under such regulations as may be prescribed by law." The argument is advanced that the quoted portion of the constitutional provision gave the legislature the power to enact the statute and we presume the argument would run that that constitutional provision would also give the legislature authority to enact any other kind of statute it so desired for setting up the machinery for the impeachment of these constitutional officers, whether such legislation should trench upon the executive branch or not. One sufficient answer to this contention is that that provision of § 174 certainly cannot be implied as conferring upon the legislature authority to disregard all other provisions of the Constitution. So when § 170 of our fundamental law specifically mandates that prosecutions shall be carried on in the name of and by authority of the State, it must be accorded that specific meaning, rather than implying that § 174 of the Constitution would give legislative competency to an act authorizing prosecutions to be carried on by private citizens through private counsel. "Such regulations as may be prescribed by law", as carried in § 174 of the Constitution, connotes more than merely statutory enactments. The supreme law is the Constitution and only when a legislative enactment conforms to constitutional requirements does it properly become a part of the body of the law which governs the body politic.

When, therefore, the considered sections of the statute seek to endow private citizens with state sovereignty to prosecute at will these constitutional officers in criminal cases of impeachment, the statute not only ignores and disregards said provision, § 170, of our organic law, but violates the plainest principles of due process. The defendant in an impeachment trial is entitled to certain safeguards guaranteed the accused in any other criminal case, one of which is that he can only be prosecuted by the state through its duly constituted officials chosen for that purpose, and to transfer this sovereign power to an individual deprives the defendant of this elemental safeguard. For analogy see Zeigler v. South & N. Ala. R. Co., supra.

Nor can I agree with what seems to me an utterly unsound proposition, as was advanced in consultation, that the mandate of said § 170, Constitution that all prosecutions shall be carried on "by authority of" the state means the "legislature" and when the legislature acted by passing the considered statute, then that is "by authority of the State of Alabama" within the meaning of said constitutional section. I regard that construction as so utterly unsound and at variance with all conception of tripartite government that it merits no answer but to state it.

Keeping in mind that this is a criminal prosecution by the state in its sovereign capacity for an alleged public offense, in which all of the elements of a criminal offense are immanent, including the principle of res judicata or former jeopardy, State ex rel. Attorney General v. deGraffenried, supra, it becomes even more apparent that the proceeding cannot be sustained when we consider a related principle, well established, that as a general rule "an individual cannot enforce a right owing to the government; certainly not in any case, unless he sustains an injury peculiar to himself." State ex rel. Foshee v. Butler, 225 Ala. 194, 195, 142 So. 533, 534. In line with this theory is the holding that not even a county can use the name of the state where it seeks "to enforce a claim which involves sovereign capacity, rather than one which relates to a function delegated to the county, and does not show a private right with the privilege of using the name of the state as a mere formal party." State ex rel. Chilton County v. Butler, 225 Ala. 191, 193–194, 142 So. 531, 533. See also 1 C.J.S., Actions, § 29, p. 1072. Hence, logical deduction would admit of no other conclusion if that theory is projected to its natural and logical consequence that less would be the power of a private citizen to exercise sovereign capacity to enforce a public right —prosecution for crime—under the guise of the considered statute, under the implication that § 174, Constitution, authorized it.

Herein, of course, lies the distinction between that status and a purely civil proceeding such as proceedings in quo warranto to test the right to public office.

This interpretation, it appears to me, squares more nearly with other related principles of established law. The control of and the authority and duty to prosecute criminal cases is not in private counsel employed by private citizens, but rests on duly elected public officials. In this court this duty rests exclusively on the attorney general, who is the chief law officer of the state. Ex parte State (In re Stephenson), 113 Ala. 85, 21 So. 210; State ex rel. Seibels v. Curtis, 18 Ala.App. 531, 93 So. 229; Ex parte State ex rel. Rains, 225 Ala. 171, 142 So. 540; Cory v. State, 22 Ala.App. 341, 115 So. 700; State ex rel. Chilton v. Butler, 225 Ala. 191, 142 So. 531; Code 1940, Title 55, §§ 228, 244. And this court has observed that, in this court, there is no other officer entitled to use the name and authority of the state and that this tribunal can recognize no other representative of the state as its legal counsel in criminal cases. Ex part State (In re Stephenson), supra. But other counsel, with his permission, may assist. Stone v. State, 233 Ala. 239, 171 So. 362. Of similar holding is the Cory case, supra, where the Court of Appeals held that even the solicitor was without authority to represent the state before that appellate court in a criminal prosecution, but that the law committed to the discretion and judgment of the attorney general the prerogative of representing the state in such a case. Even the statute now under consideration nowhere intimates that after

the information has been filed private counsel can prosecute the cause on behalf of their clients or on behalf of the state. Manifestly there would be no such authority had it been incorporated in the statute, since § 170 of our Constitution positively directs that all prosecutions shall be carried on "by authority of the State," necessarily implying that this authority is vested in the constitutional officer, the attorney general, who has the sole power and authority to represent the State in the Supreme Court in all prosecutions. With this long-settled construction, we do not think it can be implied from said § 174, Constitution, that private counsel representing private citizens could be authorized to take over the sovereign power of the state and prosecute a criminal case in this court.

The latest expression of this court with respect to the authority of the attorney general to represent the state in its sovereign capacity is State ex rel. Carmichael v. Jones, 252 Ala. 479, 41 So.2d 280. In that case the court was construing a section of the Revenue Act providing that no case pending before a court affecting the revenue laws of the state shall be dismissed by counsel representing the state, whether specially employed counsel or otherwise, except by order of the department of revenue. The attorney general had entered into an agreement of settlement of a tax case pending in the circuit court of Montgomery County and the question presented a conflict of authority between the director of the department of revenue and the attorney general. On this question the court observed:

"In view of the broad powers vested in the attorney general both by common law and under various statutes, we cannot say with any degree of certainty that the quoted provision of § 139 was intended to apply to him. * * *

"In coming to this conclusion we thus rationalize. The attorney general is a constitutional officer, the chief law officer of the state, and on him are conferred various authorities and duties in connection with instituting and prosecuting in the name of the state, suits and other proceedings at law and in equity for the preservation and protection of the rights and interests of the state (Constitution, §§ 112, 137), and if § 139 were intended to so abridge his general authority over lawsuits instituted by him by subjecting his decisions in such matters to another executive head, not necessarily learned in the law, we think it should have said so by more specific language.

"The following provisions in the Code imposing various duties and conferring various powers on the attorney general are persuasive to this view: Code 1940, Title 55, §§ 228, 229, 234, 235, 236, 240, 244. We take particular notice of § 244, which in effect provides that all litigation concerning the interest of the state or any department thereof shall be under the direction and control of the attorney general. Taking into consideration the scope of authority and duty imposed on him by these statutes, we do not think they were intended to mark the limits or bounds of his authority, but to indicate certain specific duties and confer certain definite authority in the instances mentioned. Indeed, we intimated as much in McDowell v. State, 243 Ala. 87, 89, 8 So.2d 569, 570 * * *.

"The stronger current of opinion affirms that the attorney general's powers are as broad as the common law unless restricted or modified by statute." (Citing and quoting numerous authorities) 252 Ala. 483-484, 41 So.2d 283.

I see no escape from the foregoing interpretation. The contrary interpretation, to the effect that private counsel may proceed in this criminal prosecution without regard to the duly elected constitutional officer who is vested with the sole authority and duty of representing the state in criminal cases in this court would lead to manifest incongruities. It would be to invest private counsel with discretionary power of proceeding or abandoning such impeachment prosecutions. They would therefore be invested with the power to confess any

plea which the defendant might interpose, such as one of former jeopardy, as was done by the attorney general in the de-Graffenried case. They would be empowered to enter into stipulations with respect to evidence whether in the interest of the state or not. They could, on behalf of the state, move for an order of nolle prosequi when the private ends of their clients had been achieved, although the interest of the state or the ends of justice might require a trial with an acquittal or conviction of the defendant. It would be in their discretion to persist in the prosecution of a case to promote the private animus of their client when a sound discretion might dictate a discontinuance. These and many more anomalies are suggested by adopting the interpretation contended for by the majority of my brethren.

To make the correctness of my position more manifest, let us suppose an analogy. Assume a statute which would authorize private citizens through private counsel to institute and prosecute in the circuit court a criminal case on information either as individuals or in the name of the state. The solicitor, of course, is the duly constituted official charged with the duty and empowered with the authority to represent the state in such prosecutions. Yet under such a statute his duty and authority could be ignored and disregarded while private citizens, through private counsel, could pursue the prosecution to conclusion. What a farce comedy it would be to witness the trial of such a criminal case. It would certainly be a show which runs counter to all conceptions of criminal trials, as well as confounding the constitutional concept of criminal prosecutions as embodied in said § 170 of our organic law, which specifically directs that they "shall be carried on in the name and by the authority of" the State of Alabama.

The Constitution framers evidently intended to avoid such a farcical situation by limiting the right of private citizens to institute prosecutions in cases of misdemeanors before justices of the peace or such other inferior courts by granting to the legislature such authority in the proviso of § 8 of the Constitution of 1901. But it is only in such minor criminal cases that this right has been accorded. That has been the policy of our law. Thomas v. State, 107 Ala. 61, 17 So. 941. An information is a very potent weapon in the hands of any one who might use it and the drafters of our Constitution evidently knew the seriousness of charging persons with criminal offenses and stipulated that it could only be done by grand jury indictment except in minor criminal cases. In view of the whole concept, therefore, it would seem to be a very violent departure from accepted constructions to say that the Constitution meant that the authority of the state of Alabama, with all the inherent power, could be exercised by private citizens to institute, through an information, a prosecution of impeachment in this court and carry it through to conclusion in disregard of the "authority of the State" of Alabama.

It is true the Buckley case, supra, held that an impeachment prosecution was a criminal case which might be instituted on information without indictment, but I do not read that case as anywhere interpreting the various sections of our Constitution as authorizing such a criminal prosecution to be carried on in disregard of the clear mandate of § 170 of the Constitution. The only pertinent principle enunciated in the Buckley case was that impeachment falls within the class of criminal prosecutions designated in § 8 of the Constitution which may be carried on without indictment. But this by no means is a holding that an impeachment prosecution may be carried on by an information filed by private citizens. Section 8 of the Constitution divided criminal prosecutions into three classes, including the proviso at the end of the section, to wit (as pertinent), (1) indictable offenses, (2) misfeasance and oppression in office (under which head comes impeachable offenses) which may be begun by information—it does not say information on behalf of private citizens—and (3) misdemeanors, which is specifically provided for in the proviso clause of the section, where under long practice private citizens have been per-

mitted to institute them before justices of the peace and other inferior courts. There is still nothing in the way of holding, as I see it, that the second class of criminal prosecutions, where is included misfeasance and oppression in office, may be started by information only by the officer usually charged by law with instituting such criminal informations—in the circuit court the circuit solicitor, in the supreme court the attorney general.

A fundamental concept of our democratic system is the division of powers of government. They are divided into three distinct branches—legislative, executive and judicial, "each of which shall be confided to a separate body of magistracy". § 42, Constitution. Nor shall either of these distinct divisions of government exercise the powers of the other, "to the end that it may be a government of laws and not of men." § 43, Constitution. " * * * each of these departments is emphatically forbidden to exercise any of the powers belonging to either of the others, 'unless expressly directed or permitted by the constitution.' (Italics supplied.)" Montgomery v. State, 231 Ala. 1, 3, 163 So. 365, 367, 101 A.L.R. 1394. The execution of the laws is vested in the executive department and of that department the chief law officer is the attorney general, Carmichael's case, supra; Stone v. State, supra, whose duty it is to prosecute and manage in the name of the state suits and other proceedings for the preservation of the rights and interests of the state. For a statute, without express constitutional sanction, to seek to invade the executive department by authorizing a proceeding of impeachment by private counsel, in disregard of the constitutional conception that prosecutions must be by the state and under the authority of the state's representatives lawfully charged with that duty, would seem to be an unconstitutional encroachment upon that department. It is the attorney general who is endowed with the prerogative of sovereignty to represent that executive department in the prosecution of criminal cases or in representing the state in its sovereign capacity in any other case, and for a statute to seek to transfer that prerogative to a private citizen is to my mind an unconstitutional encroachment by the legislative on the executive branch of government.

I do not wish to extend my remarks to undue length, but must notice some out-of-state cases cited by learned counsel for informants. To sustain their position that an impeachment proceeding in Alabama is not criminal in the sense that only the state may prosecute within the meaning of § 170 of the Constitution, they rely mainly on cases from some western states, such as California, Utah, Idaho, Nevada and Arizona.

It is to be observed from an examination of the constitutions and statutory systems of impeachment and removal of officers in those states, that they have a dual system, one for impeachment of high state officers and the other for the removal of lesser officers. The states seem to have followed the lead of California in setting up their systems, but generally they have constitutional provisions which provide that only the lower house of the legislature may institute impeachment proceedings with trial in the upper chamber. Generally, the officers liable for impeachment are designated in the constitutions, with the added constitutional provision that all officers not liable for "impeachment" shall be "removed" from office for certain specific offenses in such manner as may be provided by law. Then the statutes proceed to set up the dichotomous system, one for impeachment and the other for removal from office of the officers not liable to impeachment. Removal from office of these lesser officers is never termed "impeachment," since the constitution provides that such officers are not liable for impeachment. The method of removal is by judicial action in circuit or district courts by the accusation being presented either by the grand jury of the county or attorney general. Many of these states also provide for an alternative mode of removal of inferior officers for certain named offenses termed a "summary proceeding," under which an accusation may be filed by taxpayers of the county and the accused officer is summarily tried by the judge of the district court. Frequently appeal is denied. There is no

contention in these cases that the proceedings to remove these inferior officers is an impeachment. There are, of course, other states having somewhat similar constitutional and statutory provisions. Reference may be had to these in 81 A.L.R. 1089 under the annotation "Nature of proceedings under statute providing for removal of officer on accusation by grand jury, etc." A number of cases from other states are also cited there, but all are annotated under cases arising out of "removal statutes" as distinguished from an "impeachment" proceeding. See also 67 C.J.S., Officers, § 67(b), p. 290. The decisions seem to be divided on the issue of whether a removal proceeding under such statutes is civil, quasi criminal or criminal—most holding to the view that it is either civil or only partaking somewhat of a criminal proceeding—but it is to be noticed that there is no such distinction in Alabama jurisprudence either by our constitution, our statutes or our decisions, whether the proceeding for the removal of a public officer is in the senate, the supreme court, or the circuit court. It is an impeachment proceeding, which is a criminal prosecution, and the accused officer is entitled to those certain safeguards ordinarily accorded to a defendant in a criminal prosecution in Alabama. State v. deGraffenried, supra; Nelson v. State, supra. So if I were disposed to disregard what I consider the clear construction which is due to be accorded an Alabama impeachment proceeding, a distinction between the instant case and those cited by informants might be rationalized.

To conclude, then, it is my opinion that the considered provisions of the impeachment statute are clearly unconstitutional and should be stricken down.

STAKELY and GOODWYN, JJ., concur.

On the Merits.

PER CURIAM.

After the disposal of the matters of pleading discussed above, the respondent interposed a plea of not guilty.

The cause came on for hearing and there was voluminous testimony given ore tenus before the court.

It is shown above that the only charge upon which the removal of the respondent sheriff is sought is "willful neglect of duty." There are twenty-four specifications under that charge, all of which, broadly stated, allege that the respondent willfully neglected to perform his duty relative to the enforcement of the gambling laws of this state. In substance, the specifications allege that the respondent suffered and permitted in Russell County the open and widespread operation of public places where bets were taken on horse racing and baseball and where dice and card games were played for money; and suffered and permitted in said county the open and widespread operation of lotteries and mechanical gambling devices.

To an understanding of the charge of willful neglect of duty, we advert to the rule stated in Nelson v. State ex rel. Blackwell, 182 Ala. 449, 62 So. 189, 192, where it was said, in part, as follows:

"* * * that neglect of official duties, to be willful, to authorize forfeiture of office, must be characterized by a certain moral or intellectual quality different from that implied in the mere intentional doing, or failing to do, an act. The implication is of a different and more enduring status of the mental or moral faculties. There seems to be required such a determined, perverse, and obstinate neglect of official duty as will authorize an inference and finding that defendant is so morally or intellectually constituted as to be unfit for the duties of a public office. No doubt there are cases in which sufficient ground for such conclusion and for impeachment may be found in the proof of a single act of commission or omission. An occasion calling for the performance of official duty may be of such great public importance, the duty itself so undeniable and so morally urgent, conditions so insistent, as to justify and require removal from office on proof of a single act or omission; and, of course, repeated legal sins of commission or omission will furnish evidence of unfitness. Our conclusion is that the

Constitution does not intend that proof of an isolated technical violation of law shall inflexibly require a judgment of impeachment; that the willful neglect of which it speaks means more than the merely intentional omission of an act of public duty; that, to justify removal from office, it must appear that the incumbent is morally or mentally unfit; that unfitness is an inferential fact to be found by the jury which the Constitution guarantees in the cases of officers impeachable in the circuit or other court of like jurisdiction."

■ This court has heretofore observed that impeachment proceedings are highly penal in their nature and are governed by the rules of law applicable to criminal causes. Before a respondent can be convicted, it is incumbent on the prosecution to prove his guilt to the satisfaction of the court beyond reasonable doubt. State ex rel. Attorney General v. Robinson, 111 Ala. 482, 20 So. 30.

■ The acts of a respondent during a previous term may be considered as evidential facts, in so far as they are connected with or bear upon the respondent's general course of conduct during the second term, for the limited purpose of inquiring into the motive and intent of the respondent as to the acts and omissions charged to him during the second term, but an official cannot be removed because of his conduct during a previous term. State ex rel. Attorney General v. Hasty, 184 Ala. 121, 63 So. 559, 50 L.R.A.,N.S., 553. The present term of office of the respondent began on January 15, 1951, and this information against him was filed in this court on July 1, 1952. Consequently, the only acts of omission or commission which may be made the basis of removal from office are those committed by respondent during that period of time.

Respondent was first elected sheriff in 1946 for the four-year term beginning in January, 1947, and ending on January 14, 1951. He was re-elected as sheriff in 1950 for the present term. Prior to his original election he had served as deputy sheriff for a number of years and also as acting sheriff for several years during the wartime service of the sheriff.

Russell County is located in the eastern part of the state adjacent to the Georgia-Alabama boundary. It has a population of 40,364. Phenix City, the county seat, is located immediately across the Chattahoochee River from Columbus, Georgia, and has a population of 23,305. Hurtsboro, with a population of 920, is the only other incorporated municipality in Russell County. Columbus, Georgia, has a population of 79,611. Located near Columbus is Ft. Benning, a large military establishment. For many years Phenix City has been frequented extensively by military personnel from Ft. Benning. In some respects Phenix City may be considered a part of the metropolitan area of Columbus. The stated populations are according to the 1950 federal census.

At the beginning of his present term, the sheriff had two deputies. About the middle of 1951, he acquired an additional deputy. In the early part of 1952, a fourth deputy was added to his office. The police force of Phenix City consisted of approximately thirty officers. For aught appearing from the evidence, the residents of all sections of Russell County outside of the police jurisdiction of the two incorporated municipalities could look only to the respondent and his staff for law enforcement insofar as local enforcement agencies were concerned.

All five of the relators testified that they are resident taxpayers of Russell County and are parties to this proceeding. Only one gave any testimony supportive in any way of the charge. Neither this witness nor any other witness testified that the sheriff ever failed or refused when called upon to take prompt action in connection with the suppression of gambling.

■ Much of the evidence relates to the possession and operation of mechanical devices. These devices fall into two general types. One type consists of what are commonly known as "slot machines" or "roscoe machines" or "one-armed bandit machines." This type is so constructed that a successful player automatically receives a "pay-off" or reward. We will

refer hereafter to that type as slot machines. The other type consists of what are known as "pin ball machines." This type of machine is not so constructed as to automatically "pay off" a successful player, nor do such machines contain any sign or instruction that a prize or reward will be given a successful player. We will refer hereafter to this type as pinball machines. Both types are illegal gambling devices. State ex rel. Green v. One 5 Cent 5th Inning Baseball Machine, 241 Ala. 455, 3 So.2d 27; Eastburn v. Holcombe, 243 Ala. 433, 10 So.2d 457; Roberts v. State, 253 Ala. 565, 46 So.2d 5; White v. State, 253 Ala. 645, 46 So.2d 413.

We would be blind to realities if we did not acknowledge the unsavory reputation, justified or not we do not say, which Phenix City has acquired because of alleged gambling operations there through years past. We perceive that this proceeding is an outgrowth of a desire on the part of some of the citizens of Phenix City to effect a redemption from that reputation. However laudable that purpose may be, it should have no weight in determining whether respondent is guilty or innocent of the charge against him. The pertinent and sole inquiry for us to resolve is whether the respondent, as sheriff, under the evidence here presented is to be convicted of a willful neglect of the duties of his office relative to the enforcement of the gambling laws of this state during the period from January 15, 1951, to June 30, 1952.

We will not undertake to set out the evidence in great detail. It has been carefully considered by the entire court and we are clear to the conclusion that there is very little, if any, evidence tending to show that bets on horse races and baseball games were taken in public places or that lotteries were operated openly or that dice and card games were played for money in public places openly and notoriously after May, 1951.

There is some evidence to the effect that slot machines were possessed and operated in a few places in Russell County subsequent to May, 1951, but the evidence is almost without dispute that such machines disappeared in the fall of 1951.

It is undisputed that pinball machines were found in many public places throughout the county up until the time of the filing of the information. As we have heretofore pointed out, such machines are gambling devices and subject to confiscation. However, the circuit solicitor of Russell County testified that he advised the sheriff that the pinball machines were not in and of themselves gambling devices and could be possessed and operated without violating the laws of this state provided the owner or the person in possession of the machines did not "pay over the counter" to a player who made a successful score. It is without dispute in the evidence that in failing to take action against the owners or operators of the pinball machines the sheriff acted and relied upon the advice given him by the circuit solicitor. While this advice appears to have been erroneous, the relators do not seem to question the fact that such advice was both given and acted upon in good faith. We think this reliance upon the advice of the solicitor, in view of all the circumstances of the case, would not justify his conviction of willful neglect of duty, as that term is applied, in failing to move against the pinball machines or their owners or operators. Nelson v. State ex rel. Blackwell, supra, 182 Ala. at page 463, 62 So. 189; State ex rel. Attorney General v. Hasty, supra.

As pointed out above, the evidence tends to show that slot machines practically disappeared from public places in Russell County in May, 1951. We are not unmindful of the evidence going to show the seizure and destruction of a large number of these machines in the latter part of 1951 and the early part of 1952. But the evidence along this line is of such a character as to convince us that these machines had not been in operation for many months or were new and had never been uncrated, and had been stored in remote places in the outlying sections of the county, from which places they were either seized by the officers or relinquished by the owners.

We come now to consider the evidence as it relates to the period of time commencing on January 15, 1951, and ending in May, 1951. There is evidence offered on

behalf of the relators which definitely tends to support the charge that the various forms of illegal gambling heretofore enumerated were carried on openly and notoriously in many public places in Russell County, principally in Phenix City. The respondent sheriff does not deny the fact that gambling operations in Russell County, particularly in and around Phenix City, were worse during this period of time than any other during his present term of office. He denies, however, that conditions were as bad as depicted by the witnesses for the relators and his evidence is supported by other witnesses called on his behalf who had occasion to go into the public places where it is alleged that gambling operations were carried on. According to the sheriff, he promptly responded to all complaints made to him during that period of time and as the result of the number of complaints made, called upon the Governor of Alabama in April or May of 1951 for assistance in the suppression of illegal gambling. Irrespective of whether the sheriff's visit to the Governor was induced by complaints made to him by an offended citizenry, the fact that he sought assistance and acted with dispatch tends to negative, in our opinion, a willful neglect of the duties of his office relative to the enforcement of gambling laws of this state.

We do not mean to be understood as holding that a sheriff can sit idly by and act only upon complaints made to him, for it is his duty to ferret out crime in his county. Code. 1940, Title 54, Sec. 5(4). But this duty relates to all types of crimes, and its performance or lack thereof must be viewed in the light of all the surrounding circumstances, including the population and area of his county, the size of his staff, his other statutory duties as sheriff, and the presence of other agencies charged with the duty of law enforcement.

Numerous citizens appeared before this court and testified as to the good character of the respondent. This testimony must be considered along with other evidence in determining whether there was a willful neglect of duty. The witnesses who testified as to the good character of the respondent came from all sections of Russell County and other parts of the state and represented all walks of life. Although the testimony of these witnesses placed in issue the character of the respondent, and although he took the stand and testified in his own behalf, the relators did not present to this court a single witness to controvert the character witnesses offered on behalf of respondent or to reflect upon his veracity.

We observe there is nothing in the charge or in any of the specifications or in the evidence to indicate or suggest that the respondent has ever had any interest in or connection with any gambling operation of any kind.

We are not satisfied beyond a reasonable doubt from the evidence adduced that the respondent sheriff is guilty of willful neglect of official duty as is contemplated by the Constitution as grounds for impeachment and removal from office. We, therefore, conclude that the respondent is not guilty as charged in the information and judgment will be accordingly entered.

LIVINGSTON, C. J., and LAWSON, SIMPSON, STAKELY, GOODWYN and MERRILL, JJ., concur.